INTERNATIONAL TELEPHONE AND TELEGRAPH CORPORATION, Appellee,

v.

GENERAL TELEPHONE & ELECTRONICS CORPORATION and Hawaiian Telephone Company, Appellants.

No. 73–1513.

United States Court of Appeals, Ninth Circuit.

April 25, 1975.

Milton Handler (argued), New York City, for appellants.

Maxwell M. Blecher (argued), Los Angeles, Cal., for appellee.

Before ELY and GOODWIN, Circuit Judges, and WILLIAMS,* District Judge.

ALFRED T. GOODWIN, Circuit Judge:

General Telephone & Electronics Corporation and Hawaiian Telephone Company, defendants, appeal a district court judgment ordering massive divestiture of subsidiary companies in a private antitrust action brought in 1967 by International Telephone and Telegraph Corporation.[1] The judgment is affirmed in part and reversed in part.

ITT alleged that numerous acquisitions by GTE, beginning in 1950, together with trade practices which followed those acquisitions, violated §§ 1 and 2 of the Sherman Act and § 7 of the Clayton Act.[2]

As of 1969, GTE owned and controlled 33 telephone operating companies serving customers in several states. GTE also owned Automatic Electric Company, which in turn owned Lenkurt Co., Inc. Automatic Electric and Lenkurt manufacture telecommunications equipment.

The theory of ITT's case was that GTE's acquisitions had enabled GTE to effect a growing foreclosure of competition within the telecommunications equipment-manufacturing industry. By satisfying the equipment demand of its operating subsidiaries from sales by its manufacturing subsidiaries, GTE allegedly reduced to an impermissible degree the potential sales opportunities of "independent" manufacturers, such as ITT.

---

* The Honorable David W. Williams, United States District Judge for the Central District of California, sitting by designation.

1. The district court decision is reported as International Telephone & Telegraph Corp. v. General Telephone & Electronics Corp., 351 F.Supp. 1153 (D.Haw.1972).

2. 15 U.S.C. §§ 1, 2, 18.

The district court held that GTE had violated both the Sherman Act and the Clayton Act. The court ordered GTE to divest itself of Automatic and a number of operating subsidiaries.

## I. *The Clayton Act § 16 Proviso.*

GTE's first point on appeal is that the Clayton Act's § 16 proviso[3] precluding private injunction suits against common carriers regulated by the Interstate Commerce Commission bars ITT's suit. By its terms, the proviso does not apply to carriers regulated by the Federal Communications Commission.[4] However, GTE would have us look through the language of the statute to achieve conformance with the purported intentions of Congress.

We assume for the purpose of this appeal that the § 16 proviso, if it had been worded so as to apply to FCC-regulated carriers, would preclude a suit for the type of injunctive relief sought here against a noncarrier holding company[5] owning such a carrier.[6]

In 1914, when the Clayton Act was promulgated, telephone operating companies were common carriers subject to the Interstate Commerce Act[7] and thus were exempted from private injunction suits by virtue of the Clayton Act § 16 proviso. In 1934, Congress passed the Federal Communications Act,[8] which transferred jurisdiction over communications common carriers from the ICC to the FCC. Included in the Communications Act was a housekeeping amendment to § 11 of the Clayton Act reflecting the transfer of jurisdiction.[9] But Congress did not amend the § 16 proviso to extend the private injunction exemption to carriers newly made subject to the jurisdiction of the FCC. The district court held that the failure was intentional.[10] GTE urges that it was the result of oversight. The failure probably was inadvertent[11] but we need not resolve that debate to decide this case. Assuming a legislative oversight, we decline to engage in a judicial revision of the statute.

There are two circumstances in which this court may look beyond the express language of a statute in order to give force to Congressional intent: where the statutory language is ambiguous;[12] and where a literal interpretation would thwart the purpose of the over-all

---

**3.** 15 U.S.C. § 26:

"* * * *Provided*, That nothing herein contained shall be construed to entitle any person, firm, corporation, or association, except the United States, to bring suit in equity for injunctive relief against any common carrier subject to the provisions of the Act to regulate commerce, approved February fourth, eighteen hundred and eighty-seven, in respect of any matter subject to the regulation, .supervision, or other jurisdiction of the Interstate Commerce Commission."

**4.** GTE's operating-company subsidiaries are common carriers subject to the regulatory jurisdiction of the FCC. *See* 47 U.S.C. § 201 et seq.

**5.** GTE concedes in its brief that it is not a common carrier but a holding company. *See also* 351 F.Supp. at 1164–65 n.16.

**6.** The assumption actually incorporates two propositions: (1) because the injunctive relief sought here will affect the common-carrier subsidiaries, the fact that the putative defendant is a holding company is irrelevant; and (2) injunctive interference with the vertical rela-

tionship of a noncarrier subsidiary and a carrier subsidiary would encroach upon matters subject to the FCC's jurisdiction.

**7.** Act of June 18, 1910, ch. 309, § 7, 36 Stat. 544–45.

**8.** Act of June 19, 1934, 48 Stat. 1064 et seq., as amended, 47 U.S.C. § 151 et seq.

**9.** 48 Stat. at 1102 as amended, 15 U.S.C. § 21(a).

**10.** 351 F.Supp. at 1165–66, 1168.

**11.** The legislative history of the Communications Act reveals no indication of a congressional intent to alter the pre-1934 coverage of the § 16 proviso. An affidavit submitted to the district court by former Senator Clarence Dill, who sponsored the bill which became the Communications Act, stated that he had no intent to change the effect of the § 16 proviso with respect to telephone carriers.

**12.** *See, e. g.,* United States v. Oregon, 366 U.S. 643, 648, 81 S.Ct. 1278, 6 L.Ed.2d 575 (1961); Easson v. Commissioner of Internal Revenue, 294 F.2d 653, 656–57 (9th Cir. 1961).

statutory scheme or lead to an absurd result.[13] GTE has not contended that the language of the proviso is ambiguous. But it has argued that a literal interpretation would thwart the purposes of the Federal Communications Act.

The § 16 proviso was enacted to prevent private "interference by injunction with any business, or transactions in interstate carriers of sufficient public significance and importance to be within the jurisdiction of the Commission * * *." [14] The protection afforded by the proviso to common carriers regulated by the ICC is, at least to some extent, redundant. Its preclusion of private injunction suits directed against railroad mergers is clearly superfluous. Railroad mergers require prior ICC approval, which confers full antitrust immunity.[15] With respect to transactions and practices not expressly immunized, there is redundancy of exemption to the extent the ICC's regulatory scheme would, in the absence of the proviso, constitute an implied abrogation of the antitrust laws.[16]

Similarly, there would be at least some overlap between the protections afforded communications common carriers by the § 16 proviso, if applicable, and those available without the proviso. For example, the interstate rates charged by communications common carriers, if set in accordance with the provisions of the Communications Act,[17] would be immune from antitrust attack to the extent that the charging practice was subject to the regulation of the FCC.[18] Telephone operating-company mergers would be at least partially immune without the proviso if submitted to the FCC and approved.[19]

The narrow question we confront is whether any diminution in immunity resulting from the inapplicability of the § 16 proviso would thwart the regulatory scheme of the Communications Act. We do not decide whether the scheme would be equally well protected in the absence of the proviso. Such a standard would open the door to judicial revision of legislation whenever a requested revision would have any effect whatsoever in aid of discerned legislative intent. We think that a higher threshold of threat to the over-all statutory scheme must exist before judicial revision becomes appropriate. Indeed, we prefer the test employed by the Supreme Court in determining whether a regulatory scheme impliedly repeals the antitrust laws. We ask, then, whether, if the proviso remains inapplicable, there would exist a "plain repugnancy between the antitrust and regulatory provisions * * *." United States v. Philadelphia National Bank, 374 U.S. 321, 351, 83 S.Ct. 1715, 1735, 10 L.Ed.2d 915 (1963).

The question suggests its answer. The availability of a statutory exemption upon application to the FCC[20] greatly reduces the danger of collision between the "two regimes * * *." [21] and even if a statutory exemption is not obtained or is not available[22] a defendant can

---

**13.** United States v. Public Utilities Commission of Calif., 345 U.S. 295, 315, 73 S.Ct. 706, 97 L.Ed. 1020 (1953); United States v. American Trucking Associations, Inc., 310 U.S. 534, 543–44, 60 S.Ct. 1059, 84 L.Ed. 472 (1940); Sorrells v. United States, 287 U.S. 435, 446–48, 53 S.Ct. 210, 77 L.Ed. 413 (1932); Church of Holy Trinity v. United States, 143 U.S. 457, 460–61, 465–72, 12 S.Ct. 511, 36 L.Ed. 226 (1892); Gilbert v. C. I. R., 241 F.2d 491, 494 (9th Cir. 1957).

**14.** Central Transfer Co. v. Terminal Railroad Association, 288 U.S. 469, 475, 53 S.Ct. 444, 446, 77 L.Ed. 899 (1933).

**15.** 49 U.S.C. § 5.

**16.** See Pan American World Airways v. United States, 371 U.S. 296, 305–310, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963); id. at 320, 83 S.Ct. 476 (Brennan, J., dissenting).

**17.** 47 U.S.C. §§ 203–05.

**18.** United States v. Radio Corp. of America, 358 U.S. 334, 348–50, 79 S.Ct. 457, 3 L.Ed.2d 354 (1959).

**19.** 47 U.S.C. § 221(a).

**20.** 47 U.S.C. § 221(a).

**21.** Pan American World Airways v. United States, 371 U.S. at 310, 83 S.Ct. 476.

**22.** With respect to mergers between suppliers and operating companies, we doubt, as did the

make a claim of implied immunity which will be tested under the "repugnancy" standards of *Philadelphia National Bank* and its successors,[23] thus insuring that the policies of the regulatory statute will not be thwarted. If it be argued that implied immunity may not be available because, as the district court held, § 221(a) is intended to be "the *only* means given to telephone companies to evade possible attack for violation of the antitrust laws,"[24] then the short answer is that any resulting "conflict" would stem from the effect of the regulatory statute itself. Obviously there would be no "repugnancy" if the initial premise were that the regulatory scheme contemplates the applicability of the antitrust laws in the absence of a statutory exemption.

In sum, the protection afforded by the implied-immunity doctrine and the statutory exempting power of the FCC ensures that the absence of a blanket ban or injunctive remedies in private antitrust suits against communications common carriers would not thwart the purposes of the Communications Act. Accordingly, we hold that we are not at liberty to vary the express language of the § 16 proviso.

We note that GTE makes no claim of exemption or immunity in this appeal.

Tidewater Oil Co. v. United States, 409 U.S. 151, 93 S.Ct. 408, 34 L.Ed.2d 375

(1972), and Monarch Life Ins. Co. v. Loyal Protective Life Ins. Co., 326 F.2d 841 (2d Cir. 1963), cert. denied, 376 U.S. 952, 84 S.Ct. 968, 11 L.Ed.2d 971 (1964), relied on by GTE, are not controlling. The crucial difference between *Tidewater Oil* and this case is that in *Tidewater Oil* the Supreme Court determined that a literal interpretation of 28 U.S.C. § 1292(b) would thwart the policy embodied in the Expediting Act.[25] Resort to the legislative history was thus justified to discern whether the enactment of § 1292(b) had been intended as a departure from that policy. Here we have determined that the policy of the Communications Act would not be thwarted by a literal reading of the § 16 proviso. The threshold justification for varying the literal language of the statute to accord with legislative intent is thus lacking.

*Monarch Life Insurance* is similarly distinguishable.[26]

When Congress enacted the § 16 proviso it obviously intended to prevent disruption of the ICC's regulatory scheme by private parties seeking to enjoin activities of regulated carriers. The protection afforded the regulatory scheme was incomplete, however, because actions for damages, which have a serious potential for disruption,[27] were not forbidden by the proviso.[28] Subsequent Congressional efforts to preserve the integrity of regulatory schemes have taken the form,

district court, 351 F.Supp. at 1168, that the FCC enjoys antitrust exempting power under 47 U.S.C. § 221(a). It is possible, however, that under Hughes Tool Co. v. Trans World Airlines, Inc., 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973), a statutory exemption would immunize a "horizontal" merger of telephone operating companies from antitrust attack based on a theory of vertical restraint. Because neither issue is critical to our holding, we leave both unresolved.

23. *E. g.*, Otter Tail Power Co. v. United States, 410 U.S. 366, 372, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973).

24. 351 F.Supp. at 1182. *But compare* Pan American World Airways v. United States, 371 U.S. at 305–10, 320, 83 S.Ct. 476. (Implied immunity is available for transactions which could not be immunized under express immunity provision.)

25. 409 U.S. at 165, 93 S.Ct. at 417 ("* * * Acceptance of petitioner's contention would require us to conclude that § 1292(b) was intended to revise the policies underlying the Expediting Act for the first time—that it was intended as the first departure from the purposes of avoiding piecemeal appeal and of limiting review of important questions of antitrust law to this Court * * *."); *id.* at 167, 93 S.Ct. 408 (Petitioner's position would yield an "extraordinary result".).

26. *See* 326 F.2d at 845–46.

27. *See, e. g.*, Keogh v. Chicago & Northwestern Ry. Co., 260 U.S. 156, 163, 43 S.Ct. 47, 67 L.Ed. 183 (1922).

28. GTE concedes this in its brief.

not of extension of the partial protection afforded by the § 16 proviso, but rather of full antitrust immunity for transactions approved by specified agencies.[29] In certain instances, such immunity results inevitably because prior approval is required by the regulatory statute.[30] In other cases, approval—and antitrust immunity—may be sought at the option of the regulated party.[31]

This change in approach represents a rational policy choice to grant full immunity under specified conditions rather than partial immunity under all conditions. It is significant in this regard that the full-immunity approach has rendered the protections of the proviso superfluous [32] in the area where it was intended to have the greatest impact—railroad mergers.[33]

We would not assist Congress in integrating the often conflicting regimes of regulatory statutes and the antitrust laws by extending the applicability of a provision which Congress itself seems to regard as largely irrelevant to that effort.

## II. *Availability of Divestiture.*

■ The district court held that the remedy of divestiture was available to private parties suing under § 16. GTE contends that this holding was error because Congress did not intend to permit private suits for divestiture when it gave private parties the right to obtain "injunctive relief" under § 16. ITT contends that divestiture is a form of "injunctive relief" under § 16.

We hold that divestiture is not an available remedy in private actions under § 16 of the Clayton Act.

The district court concluded that neither "solid precedent [nor] clear legislative history" existed which pointed the way for a proper disposition of the divestiture issue. 351 F.Supp. at 1207. While we agree that the prior judicial decisions on this issue do not furnish persuasive authority, we conclude from the legislative history of § 16 that Congress did not intend to permit private divestiture suits.

A few courts have indicated in dicta that divestiture is available in private actions. *See, e. g.,* Bay Guardian Co. v. Chronicle Publishing Co., 340 F.Supp. 76, 81–82 (N.D.Cal.1972) ("The defendants contend that the remedy of divestiture is not available to private litigants under Section 7. While the Court readily concedes that it is venturing into unchartered territory by entertaining the remedy of divestiture for a private litigant it is persuaded that such innovations should be encouraged * * *."); Burkhead v. Phillips Petroleum Co., 308 F.Supp. 120, 126–27 (N.D.Cal.1970) (While dispute as to the availability of divestiture is not settled, motion to dismiss should not be granted since divestiture may be an available form of relief.); Julius M. Ames Co. v. Bostitch, Inc., 240 F.Supp. 521, 526 (S.D.N.Y.1965) ("Divestiture is a form of injunctive relief * * *. The statute [§ 16] does not distinguish between types of injunctive relief. Any type would seem to be permissible, when it is appropriate * *.").

These statements do not furnish persuasive authority, for they do little more than assert that divestiture is, may be, or ought to be a form of "injunctive relief".

The district court held in Calnetics Corp. v. Volkswagen of America, Inc.,[34]

---

**29.** *E. g.,* Act of Feb. 28, 1920, ch. 91, § 407, 41 Stat. 482, as amended 49 U.S.C. § 5; Act of June 19, 1934, ch. 652, Title II, § 221, 48 Stat. 1080–81, as amended 47 U.S.C. § 221; Act of Dec. 29, 1950, ch. 1184, 64 Stat. 1125, 15 U.S.C. § 18; Act of Aug. 23, 1958, Title IV, § 414, 72 Stat. 770, 49 U.S.C. § 1384.

**30.** *See, e. g.,* 49 U.S.C. § 5.

**31.** *See* 47 U.S.C. § 221(a).

**32.** *See* 49 U.S.C. § 5. GTE concedes this in its reply brief.

**33.** *See* International Telephone & Telegraph Corp. v. General Telephone & Electronics Corp., 351 F.Supp. at 1166–67 and sources cited therein.

**34.** The judgment in Calnetics has been appealed and is now pending before this court. The

348 F.Supp. 606, 616 (C.D.Cal.1972), that divestiture is available in private actions. The district court assumed the answer, however, to the very question to be resolved—whether divestiture is a type of "injunctive relief" within the meaning of § 16.

Equally unpersuasive are the decisions cited by GTE holding that divestiture is not available. *See, e. g.,* Graves v. Cambria Steel Co., 298 F. 761, 762 (S.D. N.Y.1924) ("The suit at bar, whatever else it is, is not a suit for injunction; indeed, it is really a suit for the dissolution of a monopoly pro tanto. I cannot suppose that any one would argue that a private suit for dissolution would lie under section 16 of the Clayton Act * * *.").

In the absence of persuasive case law, we turn to the legislative history. Reference to legislative history to interpret the meaning of a statute is appropriate in two situations: (1) where the statutory language is ambiguous; and (2) where a literal interpretation would thwart the over-all statutory scheme. Section 16's reference to "injunctive relief" is ambiguous. While some courts have viewed divestiture as a subspecies of "injunctive relief", others have held that injunctive remedies and divestiture are distinct categories of equitable relief and that § 16's allowance of "injunctive relief" is not broad enough to include divestiture.

The district court refused to heed the record of the House Judiciary Committee hearings on § 16 [35] because it was "usually dubious of the worth of any legislative material other than committee reports accompanying bills * * *." 351 F.Supp. at 1207 n. 150.

Committee reports are indeed entitled to greater weight than less formal indicia of Congressional intent such as floor debates.[36] But the Supreme Court, far from approving the exclusion of less formal material, has repeatedly interpreted legislation by referring to statements made in floor debates and hearings.[37] The district court in this case could properly have looked to statements by members of the House Judiciary Committee during the hearings on § 16 for guidance in determining what Congress meant by the term "injunctive relief".

During those hearings, members of the House Judiciary Committee referred several times to proposals to broaden the section by permitting private individuals to bring dissolution suits.[38] Witnesses

---

appellants in Calnetics in their briefs explicitly adopted the arguments presented by GTE with respect to the availability of divestiture in private suits. Likewise, Calnetics, in its briefs, largely repeats the arguments for divestiture presented by ITT here.

**35.** Hearings on Trust Legislation Before the House Committee on the Judiciary, 63d Cong., 2d Sess. (1914) (hereinafter referred to as House Hearings).

**36.** United States v. Auto. Workers, 352 U.S. 567, 585, 77 S.Ct. 529, 1 L.Ed.2d 563 (1957).

**37.** United States v. Enmons, 410 U.S. 396, 401–04, 402 n. 10, 404 nn. 11, 12, 13 & 14, 405–06, 405 n. 15, 406 n. 16, 408 n. 18, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973); Woodwork Manufacturers v. NLRB, 386 U.S. 612, 637, 638 n. 31, 641 n. 36, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967); Arizona v. California, 373 U.S. 546, 575–78, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963); Mastro Plastics Corp. v. Labor Board, 350 U.S. 270, 287, 76 S.Ct. 349, 100 L.Ed. 309 (1956); Schwegmann Bros. v. Calvert Corp., 341 U.S. 384, 394–95, 71 S.Ct. 745, 95 L.Ed. 1035 (1951); Ecker v. Western Pacific R. Corp., 318 U.S. 448, 473 nn. 20 & 21, 63 S.Ct. 692, 87 L.Ed. 892 (1943); United States v. San Francisco, 310 U.S. 16, 20–26, 60 S.Ct. 749, 84 L.Ed. 1050 (1940).

In support of its position the district court cited at 351 F.Supp. 1207 n. 150 a concurring opinion in Schwegmann Bros. v. Calvert Corp., 341 U.S. at 395–96, 71 S.Ct. at 751, in which Mr. Justice Jackson criticized the Court's opinion for "go[ing] beyond Committee reports, which presumably are well considered and carefully prepared" and relying on "casual statements from floor debates * * * as a basis for making up our minds what law Congress intended to enact * * *." Such a special concurrence hardly creates a rule of exclusion for all legislative history except committee reports. While Justice Jackson may have had legitimate doubts about the value of informal indicators of congressional intent, the author of the opinion for the Court obviously deemed such evidence sufficiently probative to be worthy of consideration.

**38.** House Hearings at 261, 492, 649–50, 1372–73.

were asked their views of these proposals,[39] and one witness who advocated such an expansion of § 16 was questioned by the committee.[40]

GTE places primary emphasis on the fact that in an exchange with Samuel Untermeyer, an antitrust attorney who advocated private dissolution suits, Congressman John Floyd stated:

"We did not intend by section [16] to give the individual the same power to bring a suit to dissolve the corporation that the Government has * * *. We discussed that very thoroughly among ourselves and we decided he should not have [it]."[41]

Representative Floyd's statement shows only his view of the intent of the committee at the time he spoke. At that time, the committee's intent had not fully crystallized. As a subsequent exchange between Representative Charles Carlin and witness Louis D. Brandeis reveals, the committee was still considering suggestions that the provision be expanded to allow private dissolution suits.[42]

The significance of the Floyd-Untermeyer exchange and similar colloquies[43] is that they reveal that the bare reference to "injunctive relief" in the proposed bill was not understood to permit dissolution suits. The committee viewed the provision of private injunctive relief as allowing "injunctive relief *only*" and not actions for dissolution.[44]

Since it viewed dissolution as an equitable remedy distinct from "injunctive relief", the committee would have had to broaden the language of the proposed bill along the lines suggested by Mr. Untermeyer[45] in order to demonstrate an intent to permit private dissolution suits. No such amendment was made. The inescapable conclusion is that the committee chose to reject the proposed amendments and permit "injunctive relief only". Whether Congress shared this intention is not subject to rigorous proof. However, the Congressional debates reveal no indication of an intent to broaden the meaning of "injunctive relief" to include dissolution suits.[46]

The remaining issue is whether by refusing to allow private "dissolution" suits, Congress also refused to allow private "divestiture" suits.

ITT argues that the members of the House Judiciary Committee used the term "dissolution" in a "technical" sense to mean "complete destruction of a corporation." GTE urges that "dissolution" and "divestiture" are interchangeable terms. We believe the circumstantial evidence indicates that by disallowing private suits for "dissolution" Congress also disallowed private "divestiture" suits.

■ The district court pointed out a technical distinction between "dissolution" and "divestiture".[47] Granting the distinction in current usage, it does not help ITT. The commentator upon which the district court relied stated that "dissolution refers to any situation where the dissolving of an illegal combination is involved, including the dissolution of such combinations by divestiture and divorcement.[48] If the terms do have a dis-

---

**39.** House Hearings at 261, 492, 649–50, 1372–73.

**40.** ·House Hearings at 842–45.

**41.** House Hearings at 842.

**42.** House Hearings at 649–50.

**43.** House Hearings at 261, 491–492, 649–50, 1372–73.

**44.** House Hearings at 491. (Emphasis added.)

**45.** Mr. Untermeyer proposed amending § 16 to allow an individual to obtain "injunctive *and other equitable* relief, *including an action for the dissolution of the corporation and for a receiver thereof * * *.*" (Untermeyer's proposed addition in italics.) House Hearings at 843.

**46.** *See* 51 Cong.Rec. 9261, 16319 (1914).

**47.** 351 F.Supp. at 1207 n. 151.

**48.** Note, Availability of Divestiture in Private Litigation as a Remedy for Violation of Section 7 of the Clayton Act, 49 Minn.L.Rev. 267, 270 n. 21 (1964). *See also* S. Oppenheim, Cases and Comments on Federal Antitrust Laws 1076 (2d ed. 1959).

tinct meaning for antitrust purposes, then "dissolution" is the inclusive term and "divestiture" is a subcategory.[49]

During the hearings on § 16, the members of the House Judiciary Committee used "dissolution" to include the remedy of "divestiture". Throughout the hearings references were made by members of the committee [50] and witnesses [51] to "dissolution of the trusts." One of the more frequently mentioned trusts whose "dissolution" was discussed was the Standard Oil Trust.[52] The committee was intimately familiar with the Supreme Court's decision "dissolving" the Standard Oil Trust.[53] If any specific equitable remedy was in the minds of the members of the committee when they were considering whether to give private parties the right to bring dissolution suits, then it was the remedy obtained by the government in the Standard Oil case. ·

That remedy was divestiture. In Standard Oil Co. v. United States, 221

49. GTE cites Schine Chain Theaters, Inc. v. United States, 334 U.S. 110, 126, 68 S.Ct. 947, 92 L.Ed. 1245 (1948), and United States v. Crescent Amusement Co., 323 U.S. 173, 189, 65 S.Ct. 254, 89 L.Ed. 160 (1944), for the proposition that the Supreme Court has repeatedly treated the two terms as merely verbal variants of the same concept. The matter is not quite as clear as GTE urges, but the Supreme Court does use the term "dissolution" to refer, inter alia, to the remedy of divestiture. In Schine, the Court referred to the relief granted in the prior case of Crescent Amusement Co. —a decree that the corporate exhibitors divest themselves of any stock or any other interest in any other corporate defendant or affiliated corporation—as "dissolution of the combination of the affiliated corporations." 334 U.S. at 127, 68 S.Ct. at 956. In Crescent Amusement Co. itself, the Court referred to the same relief as "divestiture." 323 U.S. at 188, 189, 65 S.Ct. 254. Similarly, in United States v. Paramount Pictures, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948), the Court referred to the relief granted by the district court as "dissolution" at one point, 334 U.S. at 151, 68 S.Ct. 915, and "divestiture" at another, 334 U.S. at 152, 68 S.Ct. 915. The relief was also described as "divorce", 334 U.S. at 153, 68 S.Ct. 915, and "disaffiliation", 334 U.S. at 151, 68 S.Ct. 915.

The terms "dissolution" and "divestiture" are not interchangeable, however. "Dissolution", as used by the Supreme Court, includes but is not restricted to the remedy of divestiture. When an unlawful combination results not from stock or asset ownership but rather from adherence to an agreement or contract then it may be "dissolved" by cancellation or by an injunction forbidding the parties from adhering to it. See United States v. Paramount Pictures, 334 U.S. at 149, 68 S.Ct. 915.

50. House Hearings at 268 (Rep. Nelson asks a witness whether the Sherman law alone is sufficient to ensure that "the 800 or more trusts now in existence will voluntarily dissolve."); id. at 273 (Rep. Nelson asks a witness whether the Sherman law in its existing form would be sufficient to permit the trusts "notably the [Standard] Oil Trust and the Tobacco Trust and the Beef Trust * * * [to] be dissolved."); id. at 492 (Rep. Nelson asks a witness whether individuals ought to be given the right to sue for dissolutions of trusts.); id. at 666 (Rep. Nelson asks a witness whether the bills which the committee proposed to enact would, if adequately enforced, ensure "that the trusts will be promptly dissolved."); id. at 963 (Rep. Carlin states that the "Sherman Act is attempting to reach a combination in the form of a trust for the purpose of dissolution."); id. at 1183 (Rep. Chandler asks witness whether he is proposing that domestic trusts should not be dissolved.).

51. House Hearings at 232–33 (Witness refers to the dissolutions of "iniquitous combinations", including the Standard Oil Trust.); id. at 492 (Witness states that individuals should not be given the right to bring a suit to dissolve a trust.); id. at 650 (Witness states that government ought to have the sole right to bring an action to dissolve a trust.); id. at 1174 (Witness states that the "Sherman Act was made to dissolve trusts.").

52. E. g., House Hearings at 425 (Witness comments on the dissolution of the Standard Oil Co. "into 34 companies."); id. at 961 (Rep. Carlin tells witness that the cases cited, including the Standard Oil case, were "suits brought for dissolution."); id. at 1507 (Rep. Nelson asks witness whether he approves of the dissolution of the Standard Oil Trust.); id. at 1507 (Chairman Clayton asks witness his view of the "dissolution of the Standard Oil Co.").

53. See, e. g., House Hearings at 75, 113, 425, 543, 666, 671, 678, 688–89, 691, 701, 853–55. Statutes should be construed by courts with reference to the circumstances existing at the time of passage, United States v. Wise, 370 U.S. 405, 411, 82 S.Ct. 1354, 8 L.Ed.2d 590 (1962), because "statutory language necessarily derives much of its meaning from the surrounding circumstances," Civil Aeronautics Board v. Delta Air Lines, 367 U.S. 316, 323, 81 S.Ct. 1611, 1618, 6 L.Ed.2d 869 (1961).

U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911), the Supreme Court approved as "clearly appropriate" an order by the court below commanding "dissolution" of the challenged combination.[54] The "dissolution" was accomplished by a decree which

" * * * in effect, directed the transfer by the New Jersey corporation back to the stockholders of the various subsidiary corporations entitled to the same of the stock which had been turned over to the New Jersey company in exchange for its stock * * * ."[55]

In short, the dissolution of Standard Oil Co. of New Jersey was accomplished by an order that it divest itself of the stock of the subsidiary corporations. In that case, the Supreme Court used the term "dissolution" to refer to the remedy of divestiture. Congress knew what the Supreme Court had approved of by way of remedy in *Standard Oil*; in the hearings on § 16 it considered and rejected proposals to extend the right to obtain that type of relief to private parties.[56] The fact that Congress, like the Supreme Court, referred to the remedy of divestiture by the name "dissolution" has no controlling force here.[57]

Prior to holding that the remedy of divestiture was available to private parties under § 16, the district court stated that

" * * * [E]ven the most conservative definition or interpretation of § 16's words * * * must admit them to embrace the same prospective relief available under the equitable remedy of divestiture * * * . If it were necessary to strain terminology

in order to accomplish the same result, a court could easily phrase a 'negative injunction' in such terms as to enjoin the activities of a corporation to such a degree that divestiture would be the only economical choice available to that corporation."[58]

As examples of such "indirect" divestiture decrees, the court cited Standard Oil Co. v. United States, 221 U.S. at 78, 31 S.Ct. 502, and American Crystal Sugar Co. v. Cuban-American Sugar Co., 152 F.Supp. 387 (S.D.N.Y.1957), aff'd, 259 F.2d 524 (2d Cir. 1958).[59] In the *Standard Oil* case the Supreme Court approved a decree which restrained Standard Oil from voting the stock of, or exercising any control over, its subsidiaries. The subsidiaries, in turn, were enjoined from declaring or paying dividends to Standard Oil and from permitting Standard Oil to vote or otherwise influence their shares.[60] In *American Crystal Sugar* the district court permanently enjoined the defendant from voting its acquired stock and from obtaining representation on the board of directors of the acquired company.[61]

Both decrees "in effect" directed divestiture.[62] While this was proper in the government's *Standard Oil* suit, GTE urges that injunctive relief aimed at accomplishing divestiture "indirectly" in a private suit is as inconsistent with Congressional intent as an explicit divestiture order. We agree. The district court could not accomplish through "verbal calisthenics"[63] that which it could not accomplish directly.

■ In holding that the remedy of divestiture is not available we do not jeop-

---

**54.** 221 U.S. at 79, 31 S.Ct. 502.

**55.** 221 U.S. at 78, 31 S.Ct. at 523.

**56.** This court is not at liberty "to supply by construction what Congress has clearly shown its intention to omit * * * ." Carey v. Donohue, 240 U.S. 430, 437, 36 S.Ct. 386, 389, 60 L.Ed. 726 (1916).

**57.** The Supreme Court has continued to call divestiture "dissolution" on occasion. *See* note 49 *supra*.

**58.** 351 F.Supp. at 1207.

**59.** 351 F.Supp. at 1207–08.

**60.** 221 U.S. at 79, 31 S.Ct. 502.

**61.** 152 F.Supp. at 400.

**62.** 221 U.S. at 78–79, 31 S.Ct. 502. *See* 351 F.Supp. at 1208–09.

**63.** 351 F.Supp. at 1208.

ardize the district court's ability to restrain GTE effectively from violating the antitrust laws. Injunctive remedies under § 16 may be as broad as necessary to ensure that "threatened loss or damage"[64] does not materialize or that prior violations do not recur.

We acknowledge that by withdrawing the remedy of divestiture we withhold from private parties the simplest, easiest, and surest form of relief for antitrust violations "whose heart is intercorporate combination and control * * *." United States v. E. I. du Pont de Nemours & Co., 366 U.S. 316, 329, 81 S.Ct. 1243, 1251, 6 L.Ed.2d 318 (1961). But we are confident that the pernicious manifestations or tendencies of an illegal vertical combination—such as an anticompetitive purchasing policy—are susceptible to direct injunctive restraint. Relief—such as an "open purchasing" requirement—directed at the symptom rather than the underlying cause may indeed prove somewhat burdensome to the enjoined party; as GTE plausibly argues in its brief, it may "hamper * * daily business and subject [the enjoined party] to the threat of contempt whenever [the prevailing party] fails to make a proposed equipment sale." If this threat is sufficiently serious, then a possible recourse for GTE is to stipulate to the remedy of divestiture as an alternative.

Because the district court will undoubtedly wish to reconsider the question of relief on remand, we decline to reach GTE's contentions that nondivestiture aspects of the relief ordered by the district court constituted an abuse of discretion. GTE's argument is largely premised on the notion that the nondivestiture relief is superfluous, given a divestiture decree. Since divestiture is not available, the argument is inapposite.

III. *Laches.*

GTE asserted that ITT was barred by laches from challenging GTE's acquisitions of Leich Electric Company (1950), Automatic Electric Company (1955), The-

odore Gary And Company (1955), Peninsular Telephone Company (1957), and Lenkurt Electric Co., Inc. (1959). The acquisitions not embraced by GTE's laches defense are those of Western Utilities (1964), Central Iowa Telephone Company (1967), Hawaiian Telephone Company (1967), and Northern Ohio Telephone Company (1968).

The district court granted ITT's motion to strike the laches defense for four reasons:

(1) It held that the equitable remedies created by § 16 of the Clayton Act were independent from and not predicated upon the legal cause of action created by § 4 of the Clayton Act; thus the four-year limitation period on actions for damages under § 4 did not apply by analogy to equitable suits under § 16.

(2) It held that equitable defenses are unavailable to defeat statutory rights or rights which further strong statutory policies.

(3) It held that ITT had alleged a continuing violation within the meaning of Hoopes v. Union Oil Co. of Calif., 374 F.2d 480, 486 (9th Cir. 1967)—successive acquisitions continuing to the year in which suit was brought—which could be "challenged at any time within (and at least for four years after) the span of such alleged violation." International Telephone and Telegraph Corp. v. General Telephone & Electronics Corp., 296 F.Supp. 920, 924 (D.Haw.1969).

(4) It held that United States v. E. I. du Pont de Nemours & Co., 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957), which permits the government to challenge an acquisition "at any time that [the] acquisition may be said with reasonable probability to contain a threat that it may lead to a restraint of commerce * * *," 353 U.S. at 597, 77 S.Ct. at 879, allows the instant suit. 296 F.Supp. at 925.

GTE urges error because (1) the availability of injunctive relief under § 16 is expressly constrained by traditional equitable defenses, including laches; and (2)

---

64. 15 U.S.C. § 26.

*du Pont* is distinguishable because it merely reflects the general rule that the defense of laches is unavailing against the government.

Much of the analysis tendered by GTE and ITT with respect to laches rests on the implicit assumption that the remedy of divestiture is available in § 16 suits. Since divestiture is not available, the issue of when, if ever, laches would bar a private suit to undo a consummated merger is moot. But even though divestiture is not available, the question remains whether laches limits the availability of those forms of equitable relief permitted by § 16.

We hold that (1) the defense of laches is available in § 16 suits; and (2) the four-year limitation period in Clayton Act § 4B, 15 U.S.C. § 15b, furnishes a guideline for computation of the laches period in suits under § 16.

### A. Availability of the Laches Defense in Section 16 Suits.

Although it is often stated that the defense of laches is addressed to the discretion of the trial judge, such a rule refers to the decision, once laches is found applicable, whether the delay involved is "unreasonable". *See, e. g.,* Whitman v. Walt Disney Productions, Inc., 263 F.2d 229, 232 (9th Cir. 1958). The conclusion that the doctrine of laches does or does not apply to a particular type of action is a conclusion of law which in no way concludes appellate review.

Given a federally-created right to go into a court of equity, the parties normally have a right to expect the court to apply principles of equity in working out the details of the remedy.

Equity, when there is no statute of limitations applicable to suits, fashions its own time limitations through laches, the doctrine embodying the principle that equity will not aid a party whose unexcused delay would, if his suit were allowed, prejudice his adversary. *See, e. g.* Russell v. Todd, 309 U.S. 280, 287, 60 S.Ct. 527, 84 L.Ed. 754 (1940).

The bare fact of delay creates a rebuttable presumption of prejudice. *See, e. g.,* Gillons v. Shell Co. of Calif., 86 F.2d 600 (9th Cir. 1936), cert. denied, 302 U.S. 689, 58 S.Ct. 9, 82 L.Ed. 532 (1937).

Although analogous statutes of limitations do not necessarily control, Holmberg v. Armbrecht, 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743 (1946), equity will look to the statute of limitations relating to actions at law of like character and usually act or refuse to act in comity with such statutes. Russell v. Todd, 309 U.S. at 287–88, 60 S.Ct. 527; Kimberly Corp. v. Hartley Pen Co., 237 F.2d 294, 301–02 n. 9 (9th Cir. 1956); Gillons v. Shell Co. of Calif., 86 F.2d at 607–08.

Clayton Act § 16 provides a private equitable remedy, analogous to the private legal remedy of Clayton Act § 4, as a method of enforcement of the prohibitions of Clayton Act § 7. The private remedies of §§ 4 and 16 were created so that nongovernment parties could, while serving their own perceived interests, assist the government in the enforcement of the antitrust laws. Injunctive relief thus serves an important public purpose while advancing a given plaintiff's interests in remaining competitive. *See* Schine Chain Theatres, Inc. v. United States, 334 U.S. 110, 68 S.Ct. 947, 92 L.Ed. 1245 (1948); Monarch Life Ins. Co. v. Loyal Protective Life Ins. Co., *supra*; Karseal Corp. v. Richfield Oil Corp., 221 F.2d 358 (9th Cir. 1955).

Against applying the doctrine of laches to § 16 actions, it is argued that such a defense would, by lessening the chance of success in some cases and increasing the frequency of successful defenses, impair the deterrent function of the Clayton Act. We doubt that, in factually clear merger cases such as are involved here, the parties considering a merger would disregard the Clayton Act in the hope that their competitors would wait too long to seek injunctive relief and that the government would not take action.

Without the equitable doctrine of laches, a plaintiff under § 16 could seriously interfere with a rival's business opera-

tions, at a time of the plaintiff's own choosing, yet the public would enjoy none of the safeguards of the public-interest standards and expertness which presumably guide the government when it is a plaintiff.

We do not believe that Congress intended, in passing § 16 of the Clayton Act, to permit potential plaintiffs to sleep through their competitors' antitrust violations and then sue many years later. The potential for economic disruption is so great that when placed in private hands it should be circumscribed by the requirement that injunction-seeking plaintiffs act with reasonable promptness unless excused by equitable considerations.

Turning to the district court's specific rationale, we find the holding that the defense of laches is unavailable because of the statutory character of a plaintiff's rights to proceed under § 16 and because of the strong public policy interest in encouraging § 16 suits erroneous as a matter of law. The holding ignores the fact that § 16 itself has a built-in limitation on equitable relief. The section provides for injunctions:

> " * * * when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings * * *."
15 U.S.C. § 26.

The phrase "under the same conditions and principles" incorporates the doctrines which normally govern the availability of equitable relief, such as laches. Assuming that Congress could deviate from these standards as it wished in order to achieve some particular statutory purpose—such as increased deterrence—it chose not to do so in § 16.

B. *Computation of Laches Time Period.*

Having determined that the laches defense is available, we turn to the factors governing its application here. The district court held that Clayton Act § 4B's four-year statute of limitations was not "incorporated" into § 16 because "the equitable remedy of § 16 is in no way 'predicated upon', incidental to or derived from the legal right of § 4 * *." 296 F.Supp. at 923.

Insofar as this holding concerns the availability *vel non* of the laches defense it is erroneous, since § 16 expressly incorporates all the normal equitable principles, including the defense of laches. But the district court's approach does raise a legitimate question with respect to the manner in which the laches period is to be computed. The district court's "predicated upon" language comes from Farbenfabriken Bayer, A. G. v. Sterling Drug Inc., 197 F.Supp. 627 (D.N.J.1961), where the court held that "the equitable remedy available under Section 16 is predicated upon the legal cause of action created by Section 4. It is essentially an equitable remedy in aid of a legal right created by the statute." 197 F.Supp. at 629. The approach taken by the *Bayer* court was thus to bar the equitable claim on the theory that the statute of limitations governing § 4 actions applied strictly to § 16. This was one of three possible approaches the *Bayer* court might have taken. The other two would have been to hold (1) that the statute of limitations on similar legal actions does not control but furnishes a useful analogy which the court of equity will ordinarily follow as a matter of comity, or (2) that the court of equity will fashion its own laches period in the absence of an analogous statute of limitations. *See, e. g.,* Metropolitan Bank v. St. Louis Dispatch Co., 149 U.S. 436, 448, 13 S.Ct. 944, 37 L.Ed. 799 (1893).

We think that the *Bayer* approach was wrong. The § 16 remedy is not, strictly speaking, predicated upon the legal cause of action created by § 4. A basis for relief may exist under § 16 but not under § 4; conduct may be enjoinable as a *threatened* violation of the substantive antitrust law under § 16 before it is actionable under § 4. Zenith Corp. v. Hazeltine, 395 U.S. 100, 130, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969).

■ The proper approach is to use § 4B's four-year limitation on § 4 actions as a guideline in computing the laches period under § 16. While we agree with the district court that the remedies or causes of action afforded by § 16 are not derived from the § 4 remedies or causes of action, we think that a basic linkage is present because of the fact that the two categories of relief serve as tools of enforcement and remedy for the same set of substantive rights. This relationship is sufficient to make the § 4 and § 16 actions of "like character", Kimberly Corp. v. Hartley Pen Co., 237 F.2d at 301, n. 9, and "analogous", Michoud v. Girod, 45 U.S. (4 How.) 503, 560, 11 L.Ed. 1076 (1846).

The district court also relied on United States v. E. I. du Pont de Nemours & Co., 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957). The reliance was misplaced. The *du Pont* case held that the government "may proceed [under the Clayton Act] at any time that an acquisition may be said with reasonable probability to contain a threat that it may lead to a restraint of commerce or tend to create a monopoly of a line of commerce * * *," 353 U.S. at 597, 77 S.Ct. at 879, and that "the test of a violation of § 7 is whether, at the time of suit, there is a reasonable probability that the acquisition is likely to result in the condemned restraints * * *." 353 U.S. at 607, 77 S.Ct. at 884.

The *du Pont* case did not involve the doctrine of laches but rather an issue of statutory construction: Does measurement of the anticompetitive potential of an acquisition by reference to its actual effect many years later convert § 7's prohibition of *acquisitions* with anticompetitive potential into a prohibition of potentially anticompetitive *holding* of stock? See 353 U.S. at 596–98, 619–26, 77 S.Ct. at 893. Even the dissenters in *du Pont* did not argue that the government should be "unable to bring an action if it fails to proceed within a few years of the stock acquisition * * * [but] only that if the Government chooses to bring its action many years later, it must prove what § 7 plainly requires— that the acquisition threatened competition when made." 353 U.S. at 624, 77 S.Ct. at 893. Indeed, the dissenters viewed the majority's threat-at-the-time-of-suit construction as removing a critical safeguard against overexuberant government enforcement precisely because it was "doubtful whether the doctrine of laches applies as against the Government * * *." 353 U.S. at 622, 77 S.Ct. at 892.

■ The doubt was well founded. Laches cannot ordinarily be asserted against the sovereign. Guaranty Trust Co. v. United States, 304 U.S. 126, 132, 58 S.Ct. 785, 82 L.Ed. 1224 (1938); Utah Power & Light Co. v. United States, 243 U.S. 389, 409, 37 S.Ct. 387, 61 L.Ed. 791 (1917). Furthermore, the remedy in § 15 (15 U.S.C. § 25), the provision under which the government sues for equitable relief, is not expressly limited, as is § 16, by "the same conditions and principles" as govern relief granted by courts of equity.

■ We find nothing in *du Pont* which detracts from our view that laches constrains private suits for injunctive relief under § 16. The most relevant message we can glean from *du Pont* is its basic teaching that an antitrust violation may occur long after a vertical relationship arises. When the relief sought in a § 16 suit is an injunction forbidding recurrence of the violation (e. g., adherence to an anticompetitive purchasing policy), it would seem proper, as a basic and initial proposition, to measure the laches period from the time when the violation occurred rather than from the time of the prior merger.

■ If relief is sought, not on the theory that past or present actions or behavior constitute actual violations of the substantive antitrust law, but because the plaintiff is threatened with an *impending* violation, then laches should normally run from the time when the plaintiff was first confronted with an enjoinable threat and thus could have obtained injunctive relief. If the threat

later matures into an actual violation and the plaintiff sues to prevent recurrence or continuation of the violation, then laches should be recomputed from the time of the subsequent actual violation.

This "double standard" for laches reflects the fact that there are two basic theories of relief for actions under § 16. Injunctions may be obtained against (1) impending violations of the substantive law, and (2) past or present violations likely to continue or recur. Zenith Corp. v. Hazeltine, 395 U.S. at 130, 89 S.Ct. 1562.

The theory of ITT's suit is that certain GTE acquisitions and accompanying trade practices constituted actual violations of the Sherman and Clayton Acts. It seeks, inter alia, to restrain the continuation of those trade practices. Accordingly, the proper starting point for computation of the laches period is the time when the alleged violations occurred.

The four-year limitation of Clayton Act § 4B for private antitrust actions for damages is long enough to enable potential plaintiffs to observe the actual effects of a possible antitrust violation and to calculate its potential effects. The abuses which would occur if plaintiffs were permitted to search the history of other firms and challenge at their pleasure any possible violations, no matter how old, seem apparent.

In adopting the four-year limitation of § 4B, we also adopt the provision of Clayton Act § 5 (15 U.S.C. § 16) suspending the statute of limitations for private rights of action based on any transactions complained of in a government antitrust proceeding during the pendency of and for one year following the government action. On remand, the district court should determine whether United States v. General Telephone & Electronics Corp., Civil No. 64–1912 (S.D. N.Y., filed June 19, 1964, and dismissed Nov. 14, 1966), suspended the statute of limitations with respect to any violations alleged by ITT in its complaint filed October 18, 1967. Even if suspension is

proper, those alleged violations which occurred prior to 1960 will be barred from challenge unless covered by some exception to the limitations doctrine or unless permitted by the district court in the exercise of its equity discretion.

An exception to the limitations doctrine exists for continuing acts. Hoopes v. Union Oil Co. of Calif., 374 F.2d at 486. The district court's holding in this case that "the pleadings herein allege a cause of action growing out of successive and multiple acquisitions continuing to the year suit was brought," 296 F.Supp. at 924, was erroneous. ITT cannot justify viewing GTE's acquisitions together as a continuing violation of the antitrust laws in order to avoid the defense of laches. If GTE's early acquisitions had the effect ITT contends they had, ITT cannot belatedly challenge them on the theory that they are now to be appraised collectively with the more recent ones as part of a continuing acquisition program. Such an evasion of laches would eliminate the need for diligence and reward the dilatory. However, other "acts" allegedly committed by GTE, such as adherence to a restrictive purchasing policy, may well fall within the continuing-acts exception. The district court should explore this matter on remand.

Those alleged violations for which the analogous limitations period has expired will be barred from attack under § 16 of the Clayton Act unless the district court determines, in the exercise of its discretion, (1) that sufficient reasons, traditionally cognizable in equity, existed which prevented the plaintiff from making a timely challenge, or (2) that the delay caused GTE no prejudice.

## IV. The Federal Antitrust Claim.

The district court found that GTE's acquisition of telephone operating companies, in conjunction with its ownership and operation of a manufacturing subsidiary, effected a foreclosure of competition in the telephone equipment-manufacturing industry sufficient to violate the federal antitrust law. 351 F.Supp. at 1198.

GTE urges that the district court erred by (1) improperly defining the product market; (2) failing to determine the anticompetitive impact of each acquisition; and (3) failing to consider the benefits of vertical integration in the telephone industry.

■ Here, as with laches, much of the district court's analysis, as well as that submitted by the parties, is premised upon the availability of the remedy of divestiture. Proof that a challenged merger constituted an actual antitrust violation is necessary before a divestiture order is proper.[65]

Nevertheless, it is appropriate to address the substantive issues in the form in which the parties have presented them. The theory of ITT's suit is that GTE committed actual violations of the Clayton and Sherman Acts. Accordingly, we must examine the district court's determination that actual violations occurred.

### A. Definition of Product Market.

In determining the extent to which GTE's vertical integration foreclosed competition among producers of telephone equipment, the district court found, as stipulated by the parties, that the relevant geographic market was the United States as a whole. It further found that the product market was "telephone equipment," consisting of apparatus, switching equipment, and transmission equipment, excluding wire and cable. 351 F.Supp. at 1172–74. Finally, the district court defined a customer market consisting of the independent (non-Bell) telephone operating companies. 351 F.Supp. at 1174–80.

### 1. Exclusion of Purchases of Telephone Equipment by the Bell System.

GTE urges that the district court erred by excluding purchases of telephone equipment by the Bell System from the product market. We agree that this was error.

Acknowledging that the Bell System was the "largest single purchaser of telephone equipment" in the United States, 351 F.Supp. at 1175, the district court refused to include Bell purchases in computing the market share foreclosed by GTE because it viewed the non-Bell—or "independent"—market for telephone equipment as constituting an "economically significant submarket" within the meaning of Brown Shoe Co. v. United States, 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). 351 F.Supp. at 1180. While the non-Bell market does display certain characteristics of a distinct submarket,[66] it is clear that the Supreme Court did not intend the Brown Shoe concept to be used to exclude, in all cases, consideration of purchases by integrated "captive" customers of an appropriately defined line of products. In Brown Shoe itself, the Court computed market share by including manufacturers' sales to captive customers, see 370 U.S. at 301–303, 82 S.Ct. 1502, despite the fact that opportunities for "independent" sales to such retailers were on the decline, id. at 301, 82 S.Ct. 1502. Similarly, in Ford Motor Co. v. United States, 405 U.S. 562, 92 S.Ct. 1142, 31 L.Ed.2d 492 (1972), the court tacitly approved a market defined to include "captive" purchases. See id. at 566–569, 92 S.Ct. 1142.

---

**65.** See United States v. Jerrold Electronics Corp., 187 F.Supp. 545 (E.D.Pa.1960), aff'd per curiam, 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961) (While the government has not produced sufficient evidence of an actual violation to permit divestiture, an injunction against future acquisitions is proper.).

**66.** See Brown Shoe Co. v. United States, 370 U.S. 294, 325, 82 S.Ct. 1502, 1524, 8 L.Ed.2d 510 (1962) ("The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recogni-

tion of the submarket as a separate economic entity * * *, distinct customers, distinct prices * * *."). ITT argues that the submarket definition accords with another Brown criterion—unique production facilities. The fact that supply items and telephone equipment are manufactured separately may support segregation of telephone equipment and wire and cable into distinct submarkets but is irrelevant in defining the customer market for telephone equipment.

■ From these cases it follows only that vertical foreclosure in itself does not justify defining a customer market to exclude "captive" sales. But here the district court relied primarily on an additional factor: the Bell Consent Decree.

The consent decree culminated an antitrust suit brought by the federal government against Bell in 1949 seeking, *inter alia*, divestiture of Bell's manufacturing affiliate, Western Electric. Under the terms of the decree, Bell was allowed to retain Western Electric but Western Electric was prohibited from manufacturing telephone equipment of a type not sold to Bell-system companies.[67]

The district court found in effect that, operating under the terms of the decree, Bell had foreclosed competition for sales of equipment to its operating companies. Determining that the consent decree immunized Bell from government antitrust attack on the basis of such foreclosure, the court concluded that "the ultimate and actual effect of the Consent Decree * * * was to sever Bell's telecommunications equipment business from the broad market and establish the independent telephone operating companies as a remaining and realistically distinct submarket." 351 F.Supp. at 1177.

■ The "immunity" which Bell purportedly enjoys under the consent decree is critical to this analysis, since the mere fact of foreclosure does not justify exclusion of "captive" purchases.[68] We need not speculate about Bell's susceptibility to government suit to find the district court's market definition clearly erroneous. Whatever "immunity" Bell enjoys under the consent decree shields it only from governmental attack and not from private antitrust actions.[69] There is thus no basis for concluding that Bell's purported foreclosure of a large fraction of the telephone equipment market is an immutable fact of market life. There is, therefore, no justification for automatic exclusion of all Bell's purchases in computing the market share of GTE's manufacturing subsidiary, Automatic Electric Co.

This is not to say that all of Bell's purchases must necessarily be included in the market. Any immunity which Bell has obtained under 47 U.S.C. § 221(a) for acquisitions of operating companies might conceivably protect it from antitrust attack on the basis of resulting vertical restraints, including a "captive" purchase policy. *See generally* Hughes Tool Co. v. Trans World Airlines, 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973). *But cf.* Aloha Airlines, Inc. v. Hawaiian Airlines, Inc., 489 F.2d 203, 208 (9th Cir. 1973), cert. denied, 417 U.S. 913, 94 S.Ct. 2612, 41 L.Ed.2d 217 (1974). It might thus be proper, in light of the trial court's findings with respect to Bell's purchasing policies, to exclude those "captive" purchases made by Bell operating companies which Bell acquired in conjunction with a grant of immunity under § 221(a). This matter should be explored by the trial court on remand.

ITT urges that any error the district court may have committed by excluding Bell's purchases was harmless because the court went on to find that GTE's acquisitions would violate the antitrust laws even if the market were defined to

67. United States v. Western Electric Co., 1956 Trade Cas. ¶ 68,246 (D.N.J.1956).

68. This fact is relevant in determining whether a trend toward concentration exists. *See* Brown Shoe Co. v. United States, 370 U.S. at 332, 82 S.Ct. 1502. The district court properly considered the Bell System's integration in finding such a trend. 351 F.Supp. at 1198.

69. *Cf.* Aluminum Co. of America v. United States, 302 U.S. 230, 58 S.Ct. 178, 82 L.Ed. 219 (1937) (Consent decree entered in prior suit does not preclude present suit since the two suits are dissimilar, *inter alia*, in respect of parties defendant.). Compare St. Louis Amusement Co. v. Paramount Pictures, 61 F.Supp. 854 (E.D.Mo.), app. dismissed, 326 U.S. 680, 66 S.Ct. 31, 90 L.Ed. 397 (1945) ("* * * While the present plaintiff was not a party to the Delaware suit, complainant is suing as a stockholder on behalf of itself and other stockholders of the Radio Corporation. That company was a party to the decree, and complainant's rights, if any, would seem to be more properly justiciable in the court that made the decree, out of which complainant's grievance arises, than here.").

include Bell's purchases. 351 F.Supp. at 1196. We must reject this argument for two reasons. First, the district court's hypothetical statement to this effect—based on an assumed fact contrary to its own finding—is speculative. Second, even if the statement were deemed an alternative holding, the district court committed other errors in defining the market which would require reversal.

We turn now to those other errors.

### 2. Exclusion of Purchases of Telephone Equipment by Non-Operating-Company Customers.

■ GTE urges that the district court committed reversible error by defining the product market to exclude purchases of telephone equipment by non-operating-telephone-company customers. We agree.

The district court excluded purchases by industrial and governmental customers and microwave common carriers because it viewed their demand for telephone equipment and that of independent telephone operating companies as creating distinct submarkets within the meaning of Brown Shoe. 351 F.Supp. at 1180.

Brown Shoe lists eight indicia of an "economically significant submarket": "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, * * * specialized vendors," 370 U.S. at 325, 82 S.Ct. at 1524, and "cross-elasticity of production facilities," id. n. 42.

■ These indicia were listed with the intention of furnishing practical aids in identifying zones of actual or potential competition rather than with the view that their presence or absence would dispose, in talismanic fashion, of the submarket issue. Whether or not a court is justified in carving out a submarket depends ultimately on whether the factors which distinguish one purported submarket from another are "economically significant" in terms of the alleged anticompetitive effect.

■ Here the district court segregated the independent telephone operating company "submarket" for telephone equipment from the industrial, governmental, and new common carrier "submarket" for the same equipment[70] because two of the Brown Shoe criteria were present: industry recognition (including statements by GTE itself in other proceedings)[71] and distinct customers.[72]

This was clearly erroneous. The state of competition in the telecommunications equipment-manufacturing industry does not depend on whether the same type of equipment is purchased by a telephone operating company, a microwave common carrier, government or industry. Customer identity and industrial recognition of an independent-telephone-operating-company "submarket" for telephone equipment are, in this instance, irrelevant because there are no corresponding factors of competitive significance in the manufacturing industry, such as differentiation of product lines, production facilities, or pricing.

In some instances, the existence of distinct customers or industry or public recognition of "submarkets" is relevant to the submarket issue. In Brown Shoe, for instance, (1) some shoes were designed for men and other shoes were designed for women, and (2) the public recognized the distinction between men's and women's shoes and purchased accordingly. These phenomena were economically significant from the point of

---

**70.** ITT contends that the district court did not "exclude" industrial and other customers of telephone equipment but simply determined that their purchases were minimal. While the court may have stated this, 351 F.Supp. at 1177–78, it also explicitly excluded such purchases on the theory that they constituted a distinct submarket. Id. at 1180.

**71.** These statements do not constitute binding judicial admissions here, since they were made in other proceedings. See Dixie Sand & Gravel Corp. v. Holland, 255 F.2d 304, 310 (6th Cir. 1958).

**72.** 351 F.Supp. at 1177–78, 1180.

view of competition at the retail level for the simple reason that men do not normally buy women's shoes for their own use, and vice versa. In the Supreme Court's language, "each [product line] has characteristics peculiar to itself rendering it generally noncompetitive with the others \* \* \*." 370 U.S. at 326, 82 S.Ct. at 1524. Since competition for sale of men's shoes is insulated from competition for sale of women's shoes by this natural barrier, it was proper to segregate the two zones of competition into distinct submarkets.

Here the telephone equipment which manufacturers sell to non-operating-company customers is not only interchangeable with equipment sold to operating companies, it is identical. It makes no difference to the manufacturer whether he sells the same piece of equipment to one type of customer or the other. To manufacturers, the only significant difference between operating-company purchases and non-operating-company purchases is that operating companies are likely to purchase in greater volume. But this difference offers no rational basis for excluding non-operating-company purchases altogether in defining the market in which manufacturers compete for sales.[73]

■ The district court also refused to include potential purchases by telephone subscribers in defining the market for telephone equipment. GTE urges that this was error, asserting that under In re Carterfone, 13 F.C.C.2d 420 (1968), subscribers are potential customers.

Carterfone declared void those tariffs filed with the FCC and state regulatory commissions by all domestic telephone operating companies prohibiting the interconnection of subscriber-owned equipment with the carrier's telephone system. 13 F.C.C.2d at 424–26. As a result of the Carterfone decision, all telephone subscribers are now free, in theory, to buy their own telephone equipment from suppliers of their choice. But telephone operating companies have succeeded in minimizing the impact of Carterfone through tariffs requiring telephone companies to supply and install interface devices.[74]

The district court agreed with an ITT official that the effect of the new interconnect tariffs "was to put a very high premium" on the cost of purchasing equipment from a manufacturer other than an affiliated supplier of the operating company.[75] The court then excluded all potential subscriber purchases on the basis of its conclusion that "decisive anticompetitive pressures have been and will be attempted to be maintained by the telephone companies with respect to subscriber apparatus, with the affiliated manufacturer continuing to have an inherently controlled outlet for such products \* \* \*."[76]

The exclusion of all potential purchases by subscribers was clearly erroneous. The market includes potential purchases of equipment by telephone subscribers from manufacturers not affiliated with the operating company serving them. This figure should be computed on the basis of a projection from the present volume, however small, of such sales.

■ Exclusion of potential sales by integrated manufacturers to customers of their operating company affiliates is proper. The cost of the interface device, which the subscriber pays only if he purchases from an independent or nonintegrated manufacturer, makes the total potential sales to subscribers by integrated and nonintegrated manufacturers an inappropriate frame of reference. It

---

**73.** ITT urges that even if the district court erred by excluding non-operating-company purchasers, the error was harmless in light of the magnitude of GTE's market foreclosure. Since that foreclosure will obviously not loom so large with the Bell System's purchases included, we think the error might well prove significant, if uncorrected.

**74.** 351 F.Supp. at 1179.

**75.** 351 F.Supp. at 1179.

**76.** 351 F.Supp. at 1179.

should be noted that our decision does not turn on the anticompetitive efforts of integrated companies, but rather on the fact that there is a significant economic barrier to sales by independent manufacturers which results from a valid tariff filed with the FCC. As a result of this barrier, the subscriber sales opportunities of integrated manufacturers are categorically different from those of nonintegrated manufacturers. The two figures should thus not be lumped together in a single market definition. In other words, the relevant fact is not that the integrated manufacturer has "captured" customers, but rather that many of the potential customers of the integrated manufacturer would not be potential customers of a nonintegrated manufacturer because of the inevitable price gap.[77]

### 3. Exclusion of Purchases of Transmission Wire and Cable.

GTE urges that the district court erred in defining the product market to include three types of telephone equipment—apparatus, switching equipment, and transmission equipment—while excluding transmission wire and cable. This was not error.

Although the district court did not indicate reliance upon them, GTE appears to have made one or more judicial admissions in the course of the present litigation to the effect that there is a market for "telephone equipment" or "telecommunications equipment" which does not include wire and cable.[78] Such admissions are conclusive in the present context.[79]

Moreover, even if GTE did not admit it, the exclusion was correct. GTE argues that there can be no rational basis for excluding wire and cable while including, in a single market, items as diverse in function and cost as simple telephone instruments and complex central-office switching equipment. But the record indicates that the industry views the types of equipment the district court categorized as "telephone equipment" as elements of a single, integrated product line.[80] These elements must function together harmoniously; there is a potential for technological clash with even the simplest telephone device, as the post-Carterfone tariffs illustrate. Thus, competition for the sale of apparatus, switching equipment, and transmission equipment is essentially competition for sale of relatively complex elements of an integrated technological system. Wire and cable, on the other hand, are viewed as fungible, noncomplex "supply" items.

Furthermore, the district court found that most of the companies manufacturing the three subcategories of telephone

**77.** GTE urges that reliance on the post-Carterfone tariffs is misplaced because the FCC may change the requirement that operating companies install an interconnecting device. The potential market, however, must normally be defined by reference to the existing regulatory framework. See generally United States v. Marine Bancorporation, 418 U.S. 602, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974).

**78.** In its trial brief GTE stated that "Western Electric Company is the largest manufacturer of telecommunications equipment * * *. Western Electric sells a complete line of telecommunications products. It manufactures and sells [switching equipment], [transmission equipment] * * * and a wide variety of apparatus * * *." Wire and cable were not included in the list of telecommunications equipment. In this brief, GTE also stated that "Automatic Electric Company and its wholly-owned subsidiary Lenkurt Electric Co., Inc., together manufacture a substantially complete line of telecommunications equipment. Automatic Electric manufactures [switching equipment]; the company also manufactures a full line of apparatus * * *. Lenkurt manufactures a full line of [transmission equipment]." Wire and cable were not included in the list of telecommunications equipment. Finally GTE stated in this brief that "supply items manufactured outside of the General System and distributed by Automatic Electric are simply not within the markets which GT&E contends are relevant."

**79.** Glick v. White Motor Company, 458 F.2d 1287, 1291 (3d Cir. 1972).

**80.** See note 78 supra and statement by GTE's chief executive officer quoted by the district court at 351 F.Supp. 1173.

equipment do not manufacture wire and cable.[81]

### B. Determination of the Anticompetitive Effect of Each Acquisition.

■ GTE urges that the district court committed reversible error by failing to make separate factual findings of illegality for each challenged acquisition. Because the relevant market was erroneously defined, we agree that new findings are necessary.

Since the remedy of divestiture is unavailable, the necessity for separate, consistent findings of legality or illegality with respect to each acquisition may be less than apparent. We think the district court should make such findings because ITT's request for relief is grounded on the theory that the acquisitions and accompanying trade practices constituted *actual* violations of the Sherman and Clayton Acts. These findings will, of course, be relevant to the scope of relief necessary to prevent recurrence of any antitrust violations.

### C. Effect of Regulation and Countervailing Social Benefits on Determination of Illegality.

GTE urges that the district court erred by not considering the impact of regulation or the advantages of vertical integration in the telephone industry in determining whether GTE's acquisitions violated the antitrust laws. Insofar as it failed to consider these factors, the trial court did not err.

■ With respect to the regulated-industry arguments, we note that

GTE makes no claim of exemption or immunity on appeal. Without such a claim, we fail to see how it can plausibly argue that the fact of extensive regulation attenuates the force of the antitrust laws as they apply to the telephone industry. Pertinent Supreme Court decisions require that a line be drawn with painstaking care between exempt and nonexempt activity.[82] If an activity is nonexempt, the antitrust laws apply with undiminished force, whether or not the activity is regulated.[83] Put another way, if a claim of exemption is rejected in an antitrust suit, the only pertinent legal frame of reference is the antitrust law. The "advantages" flowing from the challenged activity and purportedly fostered by the regulatory scheme become as irrelevant as they would be in the absence of any regulation whatsoever. A contrary rule would eviscerate in piecemeal fashion the Supreme Court's doctrine that "repeals by implication [of the antitrust laws] are not favored. Only a clear repugnancy between the old law and the new results in the former giving way and then only *pro tanto* to the extent of the repugnancy * * *." Georgia v. Pennsylvania R. Co., 324 U.S. 439, 456–57, 65 S.Ct. 716, 726, 89 L.Ed. 1051 (1945).[84]

This is not to say that the nature and extent of regulation is, in the absence of an exemption, irrelevant from a factual perspective. The impact of regulation on pricing and other competitive factors is too obvious to be ignored. In the absence of an exemption claim, the fact of regulation is significant, but not because it embodies a doctrinal scheme different from the antitrust law; the sole legal perspective is that afforded by the antitrust law. Rather, the impact of regulation must be assessed simply as another

---

**81.** 351 F.Supp. at 1172. The vendors of wire and cable on the one hand and telephone equipment on the other are thus "specialized". Brown Shoe Co. v. United States, 370 U.S. at 325, 82 S.Ct. 1502.

**82.** *See, e. g.,* Georgia v. Pennsylvania R. Co., 324 U.S. 439, 456–457, 65 S.Ct. 716, 89 L.Ed. 1051 (1945).

**83.** *See, e. g.,* Otter Tail Power Co. v. United States, 410 U.S. at 372, 93 S.Ct. 1022.

**84.** *See also* Silver v. New York Stock Exchange, 373 U.S. 341, 357, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963).

fact of market life.[85] Such was the approach we took in assessing the competitive impact of the post-*Carterfone* interface tariffs.

Thus it was proper for the trial court here to assess the practical effect of regulation on competition for sales of telephone equipment. This assessment, made in the context of an adjudication of GTE's exemption claim, led the court to the conclusion that the impact of state and federal regulation on the vertical relationships of operating companies and equipment manufacturers was minimal.

The record fully supports the district court's view that the FCC's duty to regulate the vertical relationship of telephone operating companies and equipment manufacturers has been "niggardly, laggardly and tardily exercised," 351 F.Supp. at 1181, and that state utility commissions make little or no effort to ensure the maintenance of competition in the telephone equipment-manufacturing field. 351 F.Supp. at 1202.

The trial court's failure to "discount" GTE's market share on the basis of the practical effect of state and federal regulation was not erroneous.

GTE cites FCC v. RCA Communications, Inc., 346 U.S. 86, 73 S.Ct. 998, 97 L.Ed. 1470 (1953), for the proposition that the telephone industry's special function and unique problems require that competition be tempered and, to a considerable extent, be replaced by administrative regulation. The citation of RCA might be a suitable preface to an exemption or immunity argument, because the case does indeed hold that there are "many areas of economic activ-ity in which serious inroads have been made on an original policy favoring competition." 346 U.S. at 92–93, 73 S.Ct. at 1003. But unaccompanied by an exemption claim, we fail to perceive the relevance of the case.[86]

■ GTE also cites language in Brown Shoe Co. v. United States, *supra,* to support its contention that the trial court erred in failing to take into account the "countervailing competitive, economic, or social advantages," 370 U.S. at 334, 82 S.Ct. at 1529, of vertical integration in the telephone industry. To the extent that anything said in *Brown Shoe* would require a court to balance the evil of an anticompetitive effect against a concomitant gain in efficiency resulting from economies of scale, coordination of service and research, and standardization of equipment, it would be inconsistent with the Supreme Court's subsequent holding in United States v. Philadelphia National Bank[87] and would be superseded thereby.

## V. *ITT's Claim Under the Hawaiian Antitrust Act.*

ITT'S complaint included a pendent claim under the Hawaiian Antitrust Act § 480–7(a), alleging a violation in GTE's acquisition of Hawaiian Telephone Co. Section 480–7(a) substantially duplicates Clayton Act § 7's proscription of acquisitions which "may * * * substantially * * * lessen competition or * * * tend to create a monopoly."[88] But unlike § 7, § 480–7(a) of the Hawaiian Act supplies only to threats to competition "in any line of commerce in any section of the *State.*"[89]

---

**85.** This was the approach taken in United States v. Marine Bancorporation, 418 U.S. 602, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974).

**86.** Even accompanied by an exemption or immunity claim, the *RCA* case would not be controlling because it involves an area of FCC regulation, not at issue here, in which "competition by those whose entry does not satisfy the 'public interest' standard [of the Federal Communications Act]," 346 U.S. at 93, 73 S.Ct. at 1003, is expressly prohibited.

**87.** 374 U.S. 321, 371, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963).

**88.** *Compare* 15 U.S.C. § 18 *with* Hawaii Rev. Stats. § 480–7(a).

**89.** Hawaii Rev.Stats. § 480–7(a). (Emphasis added.) Section 7 of the Clayton Act prohibits acquisitions which would threaten competition "in any line of commerce in any section of the country * * *."

The district court held that the merger would "instantly place GTE in a monopolistic position over the relevant and sole Hawaiian market," 351 F.Supp. at 1214, and that its vertical effects "would appear to approximate as nearly a per se violation of § 480–7(a) as could ever occur." 351 F.Supp. at 1215.

■ We will assume, as did the district court, that the Hawaiian Act was intended to apply to acquisitions of Hawaiian "customers" which potentially foreclose competition at the "supplier" level even if none of the affected suppliers are located in Hawaii. Assuming the act applies, the standard of illegality is the same as that embodied in § 7 of the Clayton Act. *See* 351 F.Supp. at 1214.

GTE urges that the district court erred in failing to accord exemption or implied immunity to the Hawaiian mergers and in defining the geographic market to include only sales of telephone equipment to Hawaiian Telephone Co. Because we hold that the market definition was clearly erroneous and that whatever injunctive relief the district court may order on remand under § 16 of the Clayton Act will, in effect, make the state claim redundant, we decline to reach the issues of exemption and implied immunity.

### A. Market Definition.

In holding that the nonexistence of "local (Hawaiian) manufacturers of telephone equipment" was irrelevant in defining the geographic market, the court stated that telephone equipment manufacturers "need not be physically present to effectively compete with one another. The area of effective competition does not depend on any such artificial distinctions." 351 F.Supp. at 1213. One page later in its opinion, the district court stated that "[o]bviously, GTE, by

acquiring the sole operating buyer in Hawaii of telephone communication equipment is in a position to foreclose the entire market to competitors. In Hawaii there could be no 'entry' in the market by any competing telephone company, and the acquisition would instantly place GTE in a monopolistic position over the relevant and sole Hawaiian market." 351 F.Supp. at 1214.

The statements are inconsistent: If the area of effective competition is not determined by the geographic proximity of "supplier" and "customers" (and here it is not),[90] then the customer market cannot be defined as "Hawaiian purchasers", since that definition does not reflect the sales opportunities available to U.S. manufacturers of telephone equipment.

■ The question is whether the acquisition of Hawaiian violates the Hawaiian Antitrust Act § 480–7(a), which incorporates the substantive standards of § 7 of the Clayton Act.[91] A violation of the Hawaiian Act will occur if an acquisition threatens to foreclose a substantial segment of a relevant market. That market must be defined in terms of the competitive opportunities available to the parties who allege they will suffer or have suffered because of the foreclosure. Here, it is argued, there will be a foreclosure of sales opportunities available to U.S. manufacturers of telephone equipment. Sales opportunities of U.S. manufacturers are not dependent on, or substantially influenced by, the geographic proximity of suppliers and customers. *Ergo*, it was clear error for the district court to define the geographic market so as to include only opportunities for sales to Hawaiian buyers.

### B. Relief Under the State Claim.

Upon remand, the district court should first determine whether injunctive relief

---

**90.** *See* 351 F.Supp. at 1174.

**91.** The draftsmen of the Hawaiian Antitrust Act intended that its provisions be interpreted

in accordance with federal cases decided under comparable provisions of the federal antitrust laws. *See* 351 F.Supp. at 1212 n. 163.

is appropriate under § 16, 15 U.S.C. § 26. If it finds that relief is appropriate, then it should fashion a suitable injunctive decree. Those provisions of the decree which may relate to Hawaiian Telephone Company may be reiterated in a decree restraining whatever threatened violation of the Hawaiian Antitrust Act the district court may, on remand, find is presented by GTE's ownership of Hawaiian. But we stress that the decree under the Hawaiian law may not differ in any significant respect from the decree issued under § 16. Since, as both parties and the district court concede,[92] the substantive standards of the Hawaiian Act are intended to duplicate those of the Clayton Act, no more relief is needed to restrain a potential violation of one than the other.

Because this disposition in effect neutralizes the state claim, we do not reach GTE's arguments regarding exemption or implied immunity from the Hawaiian antitrust law.[93]

We hardly need add that the remedy of divestiture shall not be available in connection with the state law claim. The Hawaiian legislature intended the Hawaiian Act to be interpreted in conformance with decisions under the federal antitrust law.[94] Accordingly, to paraphrase the district court, "[a]ll of this court's preceding analysis of remedies available under [§ 16] have full application to construction of [§ 480–7(a)] of the Hawaii Act * * *." 351 F.Supp. 1216.

We intimate no view on the validity of § 480–7(b), permitting suits for divestiture in circumstances not relevant here, insofar as that section may allow private divestiture relief for transactions which fall within the proscriptive ambit of § 7 of the Clayton Act.

## VI. *Dismissal of GTE's Contingent Counterclaim.*

The district court dismissed GTE's contingent counterclaim against ITT on the ground that 63% of the foreclosure effected by one of the challenged acquisitions (Puerto Rican Telephone Company) was covered by Parker v. Brown [95] immunity and the remaining foreclosure was, standing alone, *de minimis.* 351 F.Supp. at 1233.

GTE urges that if the district court's rejection of its immunity defense was correct, the court's application of the defense to ITT's Puerto Rican acquisition was *a fortiori* erroneous.

Since GTE has not urged an immunity defense on appeal, we have no occasion to pass on the merits of the district court's rejection of that defense. The district court's holding that antitrust immunity attaches to Puerto Rican's purchases from ITT's Puerto Rican manufacturing unit is affirmed for the reasons stated in the district court's opinion.[96]

## VII. *Award of Attorneys' Fees.*

GTE urges that the district court's award of attorneys' fees to ITT was contrary to law. ITT contends that the award was an appropriate exercise of the district court's equitable powers.

■ We hold that the specific allowance of attorneys' fees in 15 U.S.C. § 15 does not preclude an award of attorneys' fees under § 16, 15 U.S.C. § 26.

There are three subissues implicit in the district court's award of attorneys' fees: (1) Was the award inconsistent with the statutory scheme? (2) If not, does the award fall into one of the exceptions to the traditional American rule disfavoring allowance of attorneys' fees?[97] (3) If so, did the award constitute an abuse of discretion?

---

92. 351 F.Supp. at 1212, 1214.

93. GTE makes no claim of exemption or immunity from the federal antitrust law.

94. *See* 351 F.Supp. at 1212 n. 163, 1214 n. 173.

95. 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943).

96. 351 F.Supp. at 1223–32.

97. *See* Hall v. Cole, 412 U.S. 1, 4–5, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973); 6 J. Moore, Federal Practice ¶ 54.77[2], at 1703–05 (2d ed. 1974).

GTE raises only the first subissue. It contends that the explicit provision for attorneys' fees in 15 U.S.C. § 15 and the absence of such provision from § 16, 15 U.S.C. § 26, demonstrate an unequivocal decision by Congress that attorneys' fees may not be awarded in § 16 cases. As support for this proposition it cites our decisions in Talon, Inc. v. Union Slide Fastener, Inc., 266 F.2d 731, 739–40 (9th Cir. 1959), and In re Multidistrict Vehicle Air Pollution, 481 F.2d 122, 130 (9th Cir.), cert. denied, sub nom. Morgan v. Automobile Manufacturers Ass'n, 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973), as well as case law from other jurisdictions.

The statement in Talon, Inc. to the effect that attorneys' fees could not be awarded in § 16 cases was dictum.[98] The statement in Multidistrict Vehicle Air Pollution that "[i]n contrast to section 4, section 16 does not involve * * attorneys' fees"[99] scarcely concludes our inquiry since it merely characterizes the explicit provisions of § 4 and § 16, without drawing an inference that the statutory scheme precludes an award of attorneys' fees in § 16 suits.[100]

Even if the statement in Talon, Inc. were considered to be a square holding that the statutory scheme precludes an award of attorneys' fees under § 16, we would have to consider that case overruled pro tanto by the Supreme Court's subsequent holdings in Mills v. Electric Auto-Lite Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), and Hall v. Cole, 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973). In those cases the court held that express statutory provisions for recovery of attorneys' fees should not be read to deny courts the power to award attorneys' fees in suits under other sections of the statute when such an award would otherwise be appropriate.[101]

■ GTE attempts to distinguish Mills and Hall by arguing that they rest on the established principle that attorneys' fees may be awarded when the litigation has conferred a substantial benefit on others who should equitably be required to share the cost. This characterization of the two cases, while accurate,[102] does nothing to cast doubt on the applicability of the principle of statutory construction set forth in Hall and Mills —that explicit allowance of attorneys'

---

**98.** Talon did not involve a § 16 suit but a counterclaim for money damages under 15 U.S.C. § 15. The opinion in Talon quoted from Decorative Stone Co. v. Building Trades Council, 23 F.2d 426, 428 (2d Cir. 1928), which contains the language pertaining to § 16, to support its conclusion that a party may not be allowed a reasonable attorney's fee under 15 U.S.C. § 15 except as an incident to the successful prosecution of an action at law. 266 F.2d at 739–40. The rationale of Decorative Stone, incidentally, was apparently rejected by the Second Circuit in Schechtman v. Wolfson, 244 F.2d 537, 539–40 (2d Cir. 1957). But see Trans World Airlines, Inc. v. Hughes, 312 F.Supp. 478, 482 (S.D.N.Y.1970), aff'd and mod. on other grounds, 449 F.2d 51 (2d Cir. 1971), rev'd on other grounds sub nom. Hughes Tool Co. v. Trans World Airlines, Inc., 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973).

**99.** 481 F.2d at 130.

**100.** At 481 F.2d at 130 n. 12 this court carefully pointed out that in antitrust suits "[i]f only equitable relief is sought or obtained, counsel

fees are generally not awarded to a successful plaintiff * * *." (Emphasis added.) This statement, far from holding that attorney fee awards are precluded by the statutory scheme, simply observes that they are normally not appropriate in § 16 suits, in contrast to suits under 15 U.S.C. § 15. The citation at the end of footnote 12 to Hall v. Cole, 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973) demonstrates that this court in Multidistrict Vehicle Air Pollution was fully aware of the Supreme Court's holding in Hall that the mere existence of an express statutory provision for attorneys' fees does not withdraw a court's inherent equitable power to award attorneys' fees in suits under other sections of the statute.

**101.** Hall v. Cole, 412 U.S. at 10–11, 93 S.Ct. 1943; Mills v. Electric Auto-Lite Co., 396 U.S. 375, 390–91, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970).

**102.** See Hall v. Cole, 412 U.S. at 7–9, 93 S.Ct. 1943; Mills v. Electric Auto-Lite Co., 396 U.S. at 392–97, 90 S.Ct. 616.

fees in one part of the statute does not implicitly withdraw the court's power to award attorneys' fees in suits under other sections of the statute.

Whether a statutory scheme withdraws from a court of equity the power to award attorneys' fees is an issue wholly separate[103] from the question to which GTE's "distinction" might, in a properly presented argument, be relevant: Assuming *arguendo* that an award of attorneys' fees is not precluded by the statutory scheme, does it fall into one of the exceptions to the American rule disfavoring attorneys' fees? One such exception, recognized in a decision by this court dated March 25, 1974, is for suits by a "private attorney general" which advance the public interest.[104]

We find nothing in GTE's briefs which can reasonably be interpreted as challenging the district court's determination that the grant of fees fell under the "private attorney general" exception. Nor does GTE urge that the district court's award constituted an abuse of discretion. We thus decline to reach these latter subissues, and hold only that there is no statutory preclusion of attorneys' fees awards in suits under § 16.

▮ We do not retreat from the view expressed in *In re Multidistrict Vehicle Air Pollution* that counsel fee awards are normally inappropriate in § 16 actions, and we think it would be an exceptionally rare case indeed in which the award of counsel fees would be appropriate. But since GTE restricts its challenge to the bare proposition that such awards are absolutely precluded by the statutory scheme, we have no occasion to pass on the propriety of the award as a matter of judicial discretion. Hence, nothing we say should be read to condone or encourage counsel fee awards in § 16 cases. If such awards were typically and readily available, important aspects of § 16 doctrine such as standing would suffer serious distortion. *See* In re Multidistrict Vehicle Air Pollution, 481 F.2d at 130–31.

The judgment is affirmed in part and reversed in part, and the cause is remanded to the district court for further proceedings consistent with the views expressed herein.

---

103. *See* Hall v. Cole, 412 U.S. at 9, 93 S.Ct. 1943, 1948 ("This does not end our inquiry, however, for even where 'fee-shifting' would be appropriate as a matter of equity, Congress has the power to circumscribe such relief * * *.")

104. Brandenburger v. Thompson, 494 F.2d 885, 888–89 (9th Cir. 1974).