**Charles D. BENDER, Plaintiff,**

v.

**The HEARST CORPORATION,**
**Defendant.**

**Civ. A. No. 6498.**

United States District Court
D. Connecticut,
Civil Division.

June 19, 1957.

570

Dennis N. Garvey, Caplan & Garvey, Lewis E. Caplan, New Haven, Conn., for plaintiff.

Morris Tyler, Gumbart, Corbin, Tyler & Cooper, John J. Pentz, Jr., New Haven, Conn., for defendant.

ANDERSON, District Judge.

### Findings of Fact

1. In 1953 Edmund J. Riedl of Milwaukee, Wisconsin, individually, under the trade name of Crash Book Service, published and offered for sale to those interested in current costs of automobile repairs, a reporting service in the form of a loose-leaf book entitled Crash Book Service.

2. At that time and at all times up to October 10, 1956 there were four competing publications: Motor's Body Shop Flat Rate and Parts, published by the defendant; National Parts and Labor; Chilton; and Glenn-Mitchell.

3. Glenn-Mitchell was distributed almost entirely in western states with very few subscribers in the east.

4. Only Crash Book Service and National Parts and Labor were loose-leaf; and Crash Book was distinguishable from the others by presenting all necessary cost items for parts and labor for each model of each kind of car for a particular year on one page and by furnishing revisions containing current price

corrections at least once each month and more frequently if necessary. The other publications made such corrections at longer intervals.

5. The principal users of these publications were insurance companies, automobile repair shops and automobile damage appraisers.

6. Early in December 1953 the plaintiff, who was an expert automobile damage appraiser and who was forty years of age, became a part-time distributor of Crash Book Service. He continued in this status until October 1, 1954 when he was persuaded by Riedl to give up his well-paying appraisal work to become a full-time distributor of Crash Book Service.

7. The plaintiff thereafter devoted his full time and effort to this work until October 8–10, 1956. He had three full-time and twenty part-time employees or agents.

8. The distributorship agreement between the plaintiff and Riedl, at its inception, was partly established through letters and partly through oral conversations. On April 20, 1955 Riedl drafted in letter form and sent to the plaintiff a detailed statement of the terms of the distributorship agreement (Plaintiff's Exhibit B). This was signed by Riedl but, although written acceptance was added for the plaintiff's signature, he would not sign it at that time without certain modifications as to the territory which in Riedl's letter was described as follows:

> " * * * on the north by the Canadian border; on the south by the state line separating Virginia and North Carolina and on the west by a straight line drawn south from the point where Lake Champlain meets the Canadian border, continuing south through Harrisburg, Pennsylvania and continuing south from there to the point where it would intersect the state line dividing Virginia and North Carolina."

9. Shortly thereafter the plaintiff and Riedl orally agreed upon an amendment of the territorial provision by adding western New York State, exclusive of the City of Buffalo. The plaintiff agreed to sign the agreement as amended, but Riedl said it was not necessary. The terms set forth in Riedl's letter of April 20, 1955 with the amendment as to territory then became the contract between Riedl and the plaintiff concerning the plaintiff's distributorship; and, except for a minor modification relative to handling and recording of renewals by the home office of Crash Book Service in Milwaukee instead of by the plaintiff at his office in Guilford, Connecticut, this contract remained operative until October 6, 1956.

10. In effect the agreement substantially put into express terms what the plaintiff and Riedl had been doing since October 1, 1954.

11. The pertinent provisions of the agreement for the purpose of this case include: the territorial limits of the distributorship; the retail price for the service of $25 with $20 for renewals, and the price to the distributor of $15 apiece for both original and renewal subscriptions which carried one year of revision service; special wholesale prices for volume sales for which the distributor received $3 per volume on original sales and $1 on renewals; and a special retail price limit of $20 for the original and $17.50 for renewal by an insurance company in automobile damage claim work and the same for appraisers of automobile damage.

12. The agreement was to continue so long as the distributor remained active in his territory to be evidenced by maintaining a reasonable number of subscribers. Upon the death of a distributor the agreement terminated, but the distributor's widow and children were to be paid for a period of two years following the distributor's death a distributor's share of the return from renewals of sales made by the decedent in his lifetime. A distributor could withdraw from his distributorship and thereafter would be entitled to his share of the return from renewals for one year. There were general provisions concern-

ing records, accounting, handling of Crash Books on consignment and on open account, etc.

13. As of October 1, 1954 in the territory covered by the plaintiff's distributorship: 99% of Insurance Companies used National Parts & Labor; 20–25% of Automobile Repair Shops and Appraisers used Chilton; 50–60% of Automobile Repair Shops and Appraisers used National Parts & Labor; 20–25% of Automobile Repair Shops and Appraisers used Motor's Body Shop Flat Rate and Parts; and 1% of Automobile Repair Shops and Appraisers used Glenn-Mitchell.

14. As of October 1, 1956 in the territory covered by the plaintiff's distributorship: 90% of Insurance Companies used National Parts & Labor; 10% of Insurance Companies used Crash Book Service; 25–30% of Automobile Repair Shops and Appraisers used National Parts & Labor; 50% of Automobile Repair Shops and Appraisers used Crash Book Service; 10% of Automobile Repair Shops and Appraisers used Chilton; 10% of Automobile Repair Shops and Appraisers used Motor's Body Shop Flat Rate and Parts; and 1–2% of Automobile Repair Shops and Appraisers used Glenn-Mitchell.

15. The plaintiff in his territory during 1953 sold 64 Crash Book Services, in 1954 he sold 275 Crash Book Services, in 1955 he sold 1,725, and between January 1 and August 31, 1956 he sold 1,850. There were also renewals which annually ran in excess of 75% of the Crash Book Services outstanding at the end of the previous year.

16. The total national outstanding distributions of Crash Book Service for the period January 1, 1956 to October 1, 1956 was 6,891 of which approximately 3,755 were sales by the plaintiff in his territory.

17. In 1953 Riedl doing business as Crash Book Service lost $5,053.83; in 1954 he made a profit of $684.31; in 1955 he made a profit of $22,317.18; and for the first six months of 1956 he made a profit of $30,818.36.

18. The approximate total national circulation of each of the publications in this field on October 1, 1956 was: National Parts and Labor—30,000; Chilton—10,000; defendant's Motor Body Shop and Flat Rate Manual—10,000; Glenn-Mitchell—7,500; and Crash Book Service—7,000.

19. Of the individuals or corporations producing these publications all except Riedl sold the publication as only one of a multiple line of publications designed for sale to the automotive trade.

20. It was a part of the understanding between Riedl and the plaintiff in establishing plaintiff's distributorship that it would be to their mutual advantage in quickly achieving a wide distribution of Crash Book Service for the plaintiff to give to his agents the whole or a substantial part of the commissions on the original sales and to depend, himself, upon getting his return from renewals.

21. Riedl represented to the plaintiff that selling Crash Book Service was like selling insurance, that in the first few years the plaintiff would not make any money but that the percentage of renewals was very high and after the first few years the plaintiff would make his money from the repeat business.

22. The plaintiff, therefore, ploughed back into the distributorship all of his profit by paying large commissions to his salesmen and incurring other expenses in pushing the distribution of Crash Book Service so that by September 30, 1956 his two years of full-time work showed a cash loss of a few hundred dollars but he had produced over a half of all of Crash Book Service sales.

23. In March of 1956 Riedl organized a corporation under the laws of the State of Wisconsin, named Crash Book Sales, Inc.

24. Riedl intended that temporarily and on an experimental basis the corporation would act as sole sales agent for Crash Book Service. It did some printing and it gathered together in the loose-leaf folders material prepared and owned by Crash Book Service; it mailed the volumes out to subscribers and took care

of accounts with subscribers. It retained as a commission for performing these functions the difference between what it collected from a subscriber and what it paid to Crash Book Service, which in an ordinary transaction were respectively $25 and $16. It had the use of Crash Book Service's subscription and renewal records and lists. It did not act as agent for sales made by plaintiff's distributorship.

25. Riedl's purposes in experimenting with the corporate entity were to attempt to achieve tax savings for himself and to divert income to members of his immediate family.

26. The corporation owned nothing by way of tangible property and only $1,000 was paid in for its organization. It was owned by Riedl and the members of his immediate family and was wholly under his control. It had the sole right as agent to sell Crash Book Service except for plaintiff's distributorship but Riedl could revoke this agency at will. Riedl decided to terminate its existence at the time an agreement was made with the defendant on September 25, 1956 and it was dissolved in October 1956.

27. In March 1956 the defendant Hearst Corporation concluded that its Motor Body Shop and Flat Rate manual was not meeting the needs of subscribers; and it decided to discontinue it in its then existing form and to put out in place of it a loose-leaf volume with costs of parts and labor for particular automobiles quickly ascertainable and with monthly revisions.

28. The defendant estimated that it would take about two years to accomplish this change to produce a manual similar to that of Crash Book Service, which it considered the best of that type of publication. To obviate this delay and avoid the adverse effect of competition meanwhile, the defendant, which put out many publications and had resources running into many millions of dollars, decided to negotiate with Riedl, a small independent publisher with a single line product, to purchase Crash Book Service.

29. Negotiations with this end in view were commenced in May 1956 and culminated in a written contract for the sale of Crash Book Service to the defendant, entered into, drafted and executed at Milwaukee, Wisconsin on September 25, 1956.

30. In the course of the negotiations the defendant learned that while Riedl was fully aware that Crash Book Service had become overwhelmingly successful and was rapidly taking business away from its competitors, he was very fearful of the ultimate competition which he would have to meet when the other publishers in the field adopted in their own manuals the unique advantages which Crash Book Service possessed. The competitors had already adopted plans to change their publications by incorporating these advantageous features as soon as they could do so.

31. The defendant concurred in the prospect for competition from other publishers and mentioned its own plans for a new manual. It persuaded Riedl that with Crash Book Service in the defendant's hands with its very large sales force covering the whole country with multiple lines of publications, they could get ahead of the competition.

32. Under the contract Riedl received $42,500 for the trade names, copyrights, technical data, records and printed forms and good will; the defendant received an option to purchase the furniture and equipment. It agreed to pay Riedl a royalty of fifty cents per volume for Crash Book Service sold for the next ten years or until the payments totalled $100,000, whichever might first occur, and to hire Riedl as editor for two years at a salary of $10,000 per year.

33. In the course of the negotiations between May and September 25, 1956, the defendant learned of the distributorship contract existing between Riedl and the plaintiff and was familiar with its terms.

34. Although Riedl made some effort to preserve the rights of the plaintiff and some others to continue to deal in

Crash Book Services, the defendant induced Riedl to repudiate his contract with the plaintiff.

35. Riedl was induced to breach the distributorship agreement with the plaintiff by the considerations given Riedl by the defendant in the contract of September 25, 1956 for the purchase of Crash Book Service and by a specific provision therein that the defendant would pay up to $2,500 on any amount recovered by the plaintiff in any legal action against Riedl brought by the plaintiff on the claim arising out of his distributorship agreement, and the defendant further agreed to defend such action and if this occurred, Riedl agreed to assign to the defendant any claims Riedl had against the plaintiff.

36. The defendant, at the time it induced Riedl to repudiate and breach his contract with the plaintiff, knew the number of sales of Crash Book Service made by the plaintiff in his territory and knew the number of subscriptions then and there in force.

37. The defendant also knew that the plaintiff had a reasonable expectancy of profit from the renewals of those outstanding subscriptions in his territory and a probable return of substantial proportions. It also knew that the plaintiff had a reasonable expectancy of and probable profits from additional sales in his territory.

38. By the terms of the contract of September 25, 1956 with Riedl, the defendant became entitled to the portion of the profit on the renewals of outstanding subscriptions which otherwise would have gone to the plaintiff.

39. The defendant induced the breach of Riedl's contract with the plaintiff wilfully and maliciously and with the specific intent of garnering for itself the harvest which the plaintiff in more than two years of work and sacrifice of profit had labored to prepare. It was the defendant's purpose to gain for itself the very benefits which were insured to the plaintiff by the contract.

40. The plaintiff was not notified of the sale of Crash Book Service by Riedl to the defendant or of Riedl's repudiation of the distributorship agreement with the plaintiff until sometime shortly after October 6, 1956.

41. Upon acquiring Crash Book Service, the defendant changed the name of the service and the title on the volumes to "Motor's Crash Book Service" and on October 11, 1956 the defendant sent written notices to all subscribers for Crash Book Service, including the plaintiff's customers, concerning the change of name and instructing them to have no subscription dealings with or to pay any money due to anyone other than an authorized representative of Motor. The defendant refused to deal with the plaintiff.

42. The plaintiff was neither paid nor credited with any of the profit due him on renewals under his contract with Riedl after August 31, 1956.

43. The plaintiff at the time of the breach had Crash Book Service volumes in his possession on consignment all of which together were carried as an inventory of $4,275.

44. The action of Riedl and the defendant in changing the name of the service and the title of the volumes, in causing the breach of the distribution contract, and in refusing to deal with the plaintiff and furnish him revision material rendered these volumes obsolete, in whole or in part, and of no value.

45. On September 25, 1956 the plaintiff was continuing to fulfill his duties under his distribution contract with Riedl and he had done nothing during the life of the contract to cause a breach thereof or to terminate said contract or justify a repudiation by Riedl or to participate in or work a rescission of said contract.

### Conclusions

1. As to all four counts the court has jurisdiction of the subject matter and the parties.

2. As to the first count it is concluded that a valid and enforceable contract existed between the plaintiff and Edmund J. Riedl on September 25, 1956;

that the defendant on said date wilfully and maliciously, without justification or excuse, induced Riedl to breach that contract in consequence of which the plaintiff has been damaged in the amount of $87,500. Judgment may enter for said sum with interest from September 25, 1956 and costs in favor of the plaintiff.

3. Damages provide an adequate remedy for the violation of the plaintiff's rights as alleged and proved under the first count.

4. The second count may be dismissed without costs.

5. As to counts three and four it is concluded that the defendant did not violate any of the provisions of the Sherman Act or the Clayton Act and those counts may be dismissed without costs.

## Discussion

The complaint is in four counts. Recovery is granted on the first count and the other three are dismissed; the third and fourth for insufficient supporting evidence and the second, because it is largely repetitious of the first which alleges a cause of action for tortious inducement of a breach of contract. The evidence amply supports the plaintiff's claim.

■ The tort of inducing the breach of the plaintiff's valid and existing contract with Riedl took place in the State of Wisconsin and the substantive law of that state is applicable to this cause of action.

■ The defendant challenged the existence of a contract between Riedl and the plaintiff because a lengthy detailed letter (Exhibit B) from Riedl to the plaintiff purporting to set out the terms of the working agreement was signed by Riedl but was not signed by the plaintiff. Except for a slight change in the description of the distributorship territory which the plaintiff and Riedl agreed upon after its receipt, the letter embodied the terms of the working agreement which governed the relationship of the plaintiff and Riedl in the distribution of Crash Book Service in the plaintiff's territory up to the time of the breach by Riedl on September 25, 1956. It was at least a written memorandum of an oral contract which was in effect from October 1, 1954, until September 25, 1956. 2 Corbin on Contracts, Sections 498–500, 508. The defendant raised the question of the Statute of Frauds but the letter was signed by Riedl, the party whom the plaintiff claims was bound by it. 2 Corbin on Contracts, Sections 520, 523, 524. Moreover, the subsequent actions by the plaintiff and Riedl in carrying on their respective functions in the business of Crash Book Service in conformity with its terms confirmed and established with certainty the rights and duties of the parties which stemmed from it. Under these circumstances one tortiously inducing a breach of the contract cannot escape liability by invoking the Statute of Frauds. Harper and James, "The Law of Torts" Vol. 1, Section 6.7 page 495; 84 A.L.R. 49; 30 Am.Jur. page 74.

■ The defendant was fully aware of the existence of the contract and of its terms and of the rights and reasonable expectancies of profit which had accrued to the plaintiff thereunder. In spite of reassurances from defendant's and other counsel, Riedl was aware that the plaintiff was at least in a position to feel wronged, and Riedl had been reluctant to cut the plaintiff off from his distributorship as the defendant was insisting that he do. After considerable delay the defendant made additional overtures to Riedl, bettered its offer, and agreed to defend Riedl against the plaintiff and share in any recovery the plaintiff might have against Riedl. Thus the defendant induced Riedl to enter into the contract with the defendant which breached Riedl's contract with the plaintiff; and its action was the proximate cause of the breach and the resulting damage to the plaintiff. After the assignment of the assets of Crash Book Service by Riedl to the defendant, pursuant to their contract of September 25, 1956, the renewals on subscriptions from customer-subscribers in the plaintiff's territory were made with the defendant

and the profits went and are going to the defendant. The defendant knew of the high incidence of renewals, represented by Riedl to be about 90%, and it knew that in these renewals the plaintiff had a reasonably probable profit of substantial proportions. It took immediate means to cut the plaintiff off from any pursuit of these renewals. Its intention was to appropriate to itself the fruits of the plaintiff's labor and sacrifice of profit for more than two years in building up Crash Book Service sales in his territory from nothing to a point where they constituted over one-half of Crash Book Service's national sales. It is, therefore, apparent that the defendant's inducement of breach of contract was done maliciously, that is, without any shadow of privilege and without any justification or excuse and for the sole purpose of furthering its own interests. Harper and James, supra, Sections 6.6, 6.8, 6.12, 6.13; E. L. Husting Co. v. Coca Cola Co., 1931, 205 Wis. 356, 37 N.W. 85, 238 N.W. 626, 84 A.L.R. 22; Singer Sewing Machine Co. v. Lang, 1925, 186 Wis. 530, 203 N.W. 399.

As all of the elements of the cause of action have been fully established, it becomes necessary to consider the question of damages. Those suffered by the plaintiff consist of the loss of net profit (that is, his profit under the terms of the contract less his costs of sales) which he probably would have made and which he could reasonably expect to have made if his contract had not been breached. This can only be determined by projecting into the future beyond September 25, 1956, the date of the breach, the trend of Crash Book Service business in plaintiff's territory from its beginning, a consideration of the circumstances which existed relative to Crash Book Service sales in this territory at a time immediately prior to the contract of September 25, 1956, its position with respect to its competitors, and factors then reasonably foreseeable which would affect the future of Crash Book Service and plaintiff's distributorship.

The plaintiff made 1,725 new sales in 1955 and 1,850 new sales in 1956 up to August 31, 1956. It is reasonably foreseeable that this rate of increase would continue through 1957, because Crash Book Service was rapidly cutting into its competition, and rival publications were just beginning to adopt the features which were making Crash Book Service a success. It is also reasonably foreseeable that this competition from other publications would begin to be felt by the end of 1957 and new subscriptions would then begin to decline and by the end of 1960 run about 750–800 per year. While there were differing percentages given for the rate of renewals of existing subscriptions varying from something over 75% to 90%, it appears that 80% is a reasonable rate to adopt for the balance of 1956 and for the following four to five years. The whole scheme of the distributorship and the way it was handled by the plaintiff at Riedl's persuasive urging, which was to forego any profit for the first few years and, as in sales of insurance, to look to future renewals for his real return, gave tremendous impetus to the rapid distribution of Crash Book Service in a territory where it had not been sold before and the field had been occupied by competitors. In September 1956 the plaintiff stood on the threshold of entering into the enjoyment of the profits which he had foregone for the sake of the growth of the business and to which he was entitled under his contract. It may also reasonably be assumed that, while the plaintiff would retain only a small part of the profit on future new sales leaving the greater part as a commission to his salesmen, he would realize and take a net profit on renewals rather than plough it back in expenditures in an effort further to hasten the wider distribution of Crash Book Service. In any event, the profit would be his to expend as he saw fit. Riedl, however, as owner had commenced to take out the profit to which he was properly entitled. The amount is in no sense related to or to be taken as a measure of damages due the plaintiff,

but it is evident that the business had reached a stage where Riedl was no longer turning back substantial sums for expansion of Crash Book Service; and for the first half only of 1956 it appears that he took out $30,818.36 as profit.

■ The plaintiff was but forty-three years of age. He could reasonably look forward to a continuance of the business and a probable substantial net profit from his distributorship for four or five years. Making allowance, however, for uncertainties of the future, the vicissitudes of life, and exigencies which occur in the endeavors and enterprises of all; and specifically discounting the value of estimated future earnings and profits for a present payment in hand, fair and just compensation to the plaintiff for the damage directly and proximately caused him by the defendant's wrongful acts is $87,500.

Counts three and four describe causes of action based upon alleged violations of Sections 1 and 2 of the Sherman Act (15 U.S.C.A. §§ 1 and 2) and the 1950 Amendment to Section 7 of the Clayton Act (15 U.S.C.A. § 18). It has been concluded that the evidence did not fully support the claims made in these two counts and they are dismissed.

■ As to Section 1 of the Sherman Act it is apparent that the merger of Crash Book Service into the defendant corporation did not result in an unreasonable restraint on commerce among the states. The area of effective competition between Bender's Crash Book Service and the defendant's Motor Body Shop Flat Rate and Parts market consisted of those states in the plaintiff's distributorship territory, the remaining portions of states a part of which was in the plaintiff's territory, and Arizona, Colorado, Florida, Illinois, Indiana, Iowa, Louisiana, Michigan, Minnesota, Mississippi, Missouri, Ohio, Tennessee, Texas and Wisconsin. As a result of the merger Motor Body Shop Flat Rate and Parts has been eliminated and Crash Book Service is now distributed in the District of Columbia and in all of the states except Montana and is now pitted in competition in a nation-wide market against National Parts and Labor, the leader in this field, and against Chilton and, in the west against Glenn-Mitchell. Following the merger Crash Book Service, with Motor's Body Shop Flat Rate and Parts eliminated, constituted about 28% of the national market. But even in the relevant market area where, as may be inferred from distributorship area and nation-wide sales figures, Crash Book Service prior to the merger had made significant inroads on the older publications, there was still a vigorous competition left. This was also true of the nation-wide competition after the merger. Moreover, competitors were in the process of changing their publications to include the advantageous features of Crash Book and by late 1957 or shortly thereafter Motor's Crash Book Service could look forward to intensified competition. Riedl and the defendant in merging brought together Riedl's superior product with the defendant's nation-wide sales force, which could distribute Crash Book Service much more cheaply than Riedl could because defendant's salesmen handled several other publications at the same time, and defendant's other publications could be used as advertising media for Crash Book Service. It was this awareness of mutual advantage which ultimately brought about the merger.

The combination gave Motor's Crash Book Service a temporary jump on others in the field. But it did not put the defendant in a position of dominance in the trade to affect its flow or to divert it or restrain it or to dictate prices, and its probable immediate consequence was to spur improvement of the product sold by competitors. With the continued increase in motor vehicles on the highways, it appears that there was at the time of the merger an expanding market with an increase in consumer demand. There is nothing to indicate that the defendant had acquired any control over the sources of supply to meet that demand.

After the merger, as before, consumers could get as many Crash Book Serv-

ices or competitors services as they wanted even though the plaintiff was no longer able to sell Crash Book Service. Violated as the plaintiff's rights were, there was no unreasonable restraint of trade under Section 1 of the Sherman Act. United States v. Columbia Steel Co., 334 U.S. 495, 527, 68 S.Ct. 1107, 92 L.Ed. 1533.

The fact that Motor's Body Shop Flat Rate and Parts was discontinued, the fact that its planned successor in imitation of Crash Book Service never saw the light of day and thus never got into competition, and the fact that the defendant after the merger refused to deal with the plaintiff are not sufficient in the circumstances of this case to constitute a violation of Section 1 of the Sherman Act. Those conditions did not have sufficient harmful effect on freedom of commerce and vigor of competition in the auto body manual industry in the relevant market to be regarded as "restraint of trade or commerce" within the intent of Section 1. United States v. Columbia Steel Co., supra; Apex Hosiery Co. v. Leader, 310 U.S. 469, 493, 60 S.Ct. 982, 84 L.Ed. 1311; Standard Oil of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619.

■ With regard to the allegations under Section 2 of the Sherman Act, it does not appear that the defendant has by the merger monopolized or attempted to monopolize or combined or conspired to do so. The defendant, as a result of the merger, acquired no power to fix prices or to exclude competition, United States v. E. I. Du Pont De Nemours & Co., 351 U.S. 377, 389, 76 S.Ct. 994, 100 L.Ed. 1264; American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575; nor could it lessen quality or restrict production throughout the industry in the relevant market. Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311. While an effect of the merger was to eliminate Riedl as a competitor, this came about through negotiation and an agreement voluntarily entered into for business reasons of mutual advantage. Defendant

neither had nor attempted to exercise the power to compel Riedl to choose between selling out or being run out of business.

Nor is there any evidence here of an attempt to monopolize. Since it has been found that there was no monopolization, a finding of an attempt to monopolize would have to rest on a showing that there was a plan to reach out beyond this acquisition by additional mergers or the equivalent or that the defendants intended to use the acquisition itself to monopolize even though it did not in fact achieve its goal. United States v. Griffith, 334 U.S. 100, 107, 68 S.Ct. 941, 92 L.Ed. 1236; United States v. Columbia Steel Co., 334 U.S. 495, 531–533, 68 S.Ct. 1107, 92 L.Ed. 1533; United States v. Aluminum Co. of America, 2 Cir., 1945, 148 F.2d 416, 431–432. Similarly, though Riedl and the defendant acted in agreement, their actions and purposes were not those of a conspiracy to monopolize the auto body manual industry. They neither expected nor intended to dominate that field.

Defendant's refusal to sell its particular publication to plaintiff in wholesale lots is the ordinary business consequence of the fact that it has its own sales staff. Here defendant has no dominance of the industry nor price-fixing purpose such as existed in Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684. Moreover, Hearst was never contractually obligated to Bender and appears from the evidence not to deal at all through distributors but rather entirely through employee-salesmen.

There is not apparent in the evidence concerning this merger and its surrounding circumstances anything from which it can be said that there is a violation of Sections 1 or 2 of the Sherman Act.

■ Section 7 of the Clayton Act does not apply to this case as the provisions of the section extend only to the acquisition by a corporation of the stock or assets of another *corporation*. The assets conveyed by Riedl to the defendant were owned by Riedl as an individual; and Congress did not include within the

 

terms of this statute the transfers of *individually* owned assets to a corporation. There was Crash Book Sales, Inc., which, the plaintiff claims, owned some assets which eventually went to the defendant as a result of the merger, but there is not sufficient evidence to find this. Crash Book Sales, Inc., was organized as an experiment to be tried out for a short while by Riedl. It was designed to act as sole distributor and sales agent. It collected accounts receivable which were owned by Riedl, doing business as Crash Book Service. In anything it did, it was really acting as agent for Riedl, an individual. It was entirely his creature and separated from him, as Crash Book Service, it had no life. The contract which gave it sustenance could be cancelled by Riedl on ten days notice. Considering the nature and function of this corporation and the circumstances surrounding its existence, it must be concluded that this ancillary and wholly dependent entity unable to stand on its own feet, was not the kind of corporate entity nor was its temporary handling of any of Riedl's Crash Book Service property the kind of ownership of assets contemplated by Congress for the purposes of Section 7 of the Clayton Act. This is not to say that a family corporation or a corporation owned or controlled by a single individual is not within the terms of the Clayton Act. Such is by no means the law. The distinguishing characteristics of Crash Book Sales, Inc., which remove it from the application of the statute are its temporary, limited functions as an agent for Riedl coupled with the fact that it neither owned nor transferred to the defendant any assets which were of any significance as sinews of war in the field of trade and competition involved.

Except for this it is apparent that this case would fall within that class of mergers which have not attained the effects which bring them within the provisions of the Sherman Act, but which may have the effect of substantially lessening competition within the terms of the 1950 amendment to Section 7 of the Clayton

Act. Transamerica Corp. v. Board of Governors of Federal Reserve System, 3 Cir., 1953, 206 F.2d 163, 169; Hamilton Watch Co. v. Benrus Watch Co., D.C. 1953, 114 F.Supp. 307, affirmed 2 Cir., 1953, 206 F.2d 738.