JULIUS NASSO CONCRETE CORP., S & A Concrete Co., Inc., S & A Fireproofing Co., Inc., and Julius Nasso Concrete Corp.—S & A Concrete Co., Inc., a Joint Venture, Plaintiffs,

v.

DIC CONCRETE CORP., Dic Construction Corp., Dic Concrete Corp. and Underhill Construction Corp., a Joint Venture d/b/a Dic-Underhill, a Joint Venture, Certified Industries Corporation and Joseph DePaola, Walter Goldstein, Frank Phalen, Anthony Bertone, and Bernard Jereski, Individually, Defendants.

No. 78 Civ. 2865.

United States District Court,
S. D. New York.

March 28, 1979.

Bandler & Kass, New York City, for plaintiffs; William J. Werner, and Richard L. Gold, New York City, of counsel.

Golenbock & Barell, New York City, for defendants; Michael C. Silberberg, and Irene M. Guimera, New York City, of counsel.

## OPINION

ROBERT L. CARTER, District Judge.

This is an antitrust case concerning alleged monopolization of the concrete subcontracting trade in four boroughs of New York City. The charges include violations of the Sherman Act §§ 1 & 2 (15 U.S.C. §§ 1 & 2) and the Clayton Act as amended by the Robinson-Patman Act §§ 2(a), 2(f) & 7 (15 U.S.C. §§ 13(a), 13(f), & 18). Plaintiffs are three corporations suing individually and as members of a joint venture (collectively referred to as "Nasso"). Defendants also include three corporations sued individually and as members of a joint venture (collectively referred to as "DIC–Underhill"). The other defendants are named individuals said to be in control of the joint venture and an additional corporation, Certified Industries ("Certified"), said to be controlled by the named individuals or the joint venture. Nasso seeks treble damages under 15 U.S.C. § 15, injunctive relief under 15 U.S.C. § 28, and an order of divestiture. Defendants now move to dismiss certain portions of the complaint.

Plaintiff corporations perform concrete work on large construction projects in Manhattan, the Bronx, Brooklyn, and Queens. They banded together to form Nasso in May, 1975, purportedly in a futile effort to counteract the market power amassed by DIC–Underhill. Defendant subcontractors are competitors who, under the guidance of the named individuals (controlling stockholders, officers, and directors) formed DIC–Underhill in 1964. Thereafter, in 1973, DIC–Underhill and/or the individual defendants acquired control of Certified, one of the two suppliers of building materials in this area capable of meeting their

substantial requirements. Since that time, Nasso has been unable to secure any significant contracts, and DIC–Underhill presently controls 80% of the relevant market.

The combination into DIC–Underhill and the subsequent acquisition of Certified are alleged to violate the proscription embodied in the Clayton Act § 7 against mergers that tend to promote monopoly. Defendants are also alleged to have misused their control of Certified by manipulating the price of concrete materials so as to discriminate against Nasso in contravention of Robinson-Patman Act §§ 2(a) & 2(f). Finally, Nasso contends that DIC–Underhill has abused its pre-eminent market position by posting performance bonds for building projects on which it has applied for the concrete subcontract in exchange for which the prime contractor awards it the job without soliciting competitive bids. This procedure, along with the more specific antitrust violations, is cited as evidence of defendants' illegal conspiracy to monopolize and restrain trade in violation of Sherman Act §§ 1 & 2.

*Price Discrimination*

Defendants first move to dismiss the price discrimination claims because Nasso, having never purchased or attempted to purchase concrete supplies from Certified, has no standing to sue. Initially, standing to sue under §§ 2(a) & 2(f) was limited to actual purchasers from the alleged price discriminator. *See, e. g., Klein v. Lionel Corp.,* 237 F.2d 13, 14 (3rd Cir. 1956). Nasso freely admits that it never bought or attempted to buy concrete materials from Certified and that it does not have standing as a direct purchaser. Later decisions, however, have approved suits by indirect purchasers from the price discriminator, and it is under this rubric that Nasso asserts standing to sue DIC–Underhill.

The indirect purchaser doctrine was developed by the courts in response to price discriminators shielding themselves from suit by charging disparate prices through middlemen. In *American News Co. v. F.T.C.,* 300 F.2d 104 (2d Cir.), *cert. denied,* 371 U.S. 824, 83 S.Ct. 44, 9 L.Ed. 64 (1962),

the court permitted buyers discriminated against through the agency of a middleman to sue the original seller if it had dealt directly with the buyer and if it had indeed controlled the terms of the sale. Thus, the price discriminator could not escape liability by interposing a wholesaler between itself and the victim of the illegal charges.

While approving the indirect purchaser doctrine in *F.T.C. v. Fred Meyer, Inc.,* 390 U.S. 341, 88 S.Ct. 904, 19 L.Ed.2d 1222 (1968), the Supreme Court also expanded its reach. The Court there permitted an indirect purchaser injured by a manufacturer's policy of granting discounts to large retailers with which it dealt directly to sue the manufacturer even where:

1. the indirect purchaser had not had direct dealings with the manufacturer, and

2. it was not clear that the manufacturer had control over the terms of the sale from the wholesaler to the indirect purchaser.

So long as the manufacturer adopted a pricing structure that favored a direct purchaser, a competing, disfavored indirect purchaser had standing to sue the manufacturer. *F.T.C. v. Fred Meyer, Inc., supra,* 390 U.S. 354, 88 S.Ct. 904. The Supreme Court based its expansive holding on a finding that " 'customers' in § 2(d) includes retailers who buy through wholesalers and compete with a direct buyer in the resale of the supplier's product." *Id.* at 354, 88 S.Ct. at 911. Although the decision was rendered only under § 2(d), the rationale applies equally to §§ 2(a) & 2(f). *Checker Motors Corporation v. Chrysler Corporation,* 283 F.Supp. 876, 888 (S.D.N.Y.1968) (Pollack, J.) (in a suit under § 2(a), direct dealing and control requirements need not be met where the defendant engaged in direct sales to favored purchaser); Callman, *The Law of Unfair Competition, Trademarks, and Monopolies* § 28.1(f) (3rd Ed. 1969) (Court moving toward allowing all indirect purchasers to sue manufacturers who "knowingly permit" sale of products at discriminatory prices). Since Certified sold directly to DIC–Underhill, the alleged favored pur-

chaser, the test of *F.T.C. v. Fred Meyer, Inc.* applies and Nasso need not meet the "control" and "direct dealings" requirements.[1]

 Nasso has not succeeded in showing that it falls within the class of indirect purchasers currently protected by the rule of *F.T.C. v. Fred Meyer, supra.* In that case, as in all prior cases, the Court required that the indirect purchaser compete with a favored retailer in the sale of the supplier's products. In the instant case, however, Nasso never purchased or attempted to purchase Certified's concrete materials at any point in the distributive chain. Instead, it dealt exclusively with its own supplier, Transit-Mix Concrete Corp. ("Transit-Mix"). Thus, Nasso admits to being neither a direct nor an indirect purchaser of Certified's products.

Undaunted, Nasso argues that it is nonetheless entitled to sue Certified because Certified realized its pricing policy through Transit-Mix, which functioned as its unwitting agent. Under those circumstances, Nasso claims status as an indirect purchaser because it buys the same product sold by Certified and is adversely affected by Certified's pricing policy. It should not matter, Nasso contends, that Transit-Mix is not a wholesaler of Certified's products so long as it serves as the "middleman" in Certified's scheme.

The substance of Nasso's charge is that Certified deliberately raised its prices with the knowledge that Transit-Mix would fol-

---

1. An inquiry into whether the indirect purchaser doctrine as espoused in *F.T.C. v. Fred Meyer, Inc., supra,* survives *Illinois Brick v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977) is warranted. In that case, the Supreme Court overruled the indirect purchaser doctrine as developed under Sherman Act § 1. *See, e. g., In re Western Liquid Asphalt Cases,* 487 F.2d 191 (9th Cir. 1973), *cert. denied sub nom. Standard Oil Co. v. Alaska,* 415 U.S. 919, 94 S.Ct. 1419, 39 L.Ed.2d 474 (1974); *Armco Steel Corp. v. North Dakota,* 376 F.2d 206 (8th Cir. 1967); *Illinois v. Ampress Brick Co.,* 536 F.2d 1163 (7th Cir. 1976) and cases cited therein. The question, therefore, is whether the indirect purchaser doctrine rejected in *Illinois Brick* is sufficiently similar to the doctrine of the same name applied under the price discrimination provisions to warrant finding that the latter is no longer viable.

The indirect purchaser doctrine under the Sherman Act was developed to allow any buyer of a monopolist's products to sue the monopolist regardless of the buyer's position in the chain of distribution. *Illinois Brick v. Illinois,* 431 U.S. 720, 723–26, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977); *West Virginia v. Chas. Pfizer & Co.,* 440 F.2d 1079, 1086–88 (2d Cir.), *cert. denied sub nom. Cotler Drugs, Inc. v. Chas. Pfizer & Co.,* 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971); Callman, *Unfair Competition and Monopolies,* Vol. 1 § 15.3(e)(5). Thus each purchaser could sue the monopolist directly for damages that had been passed on by entities above it in the chain of distribution. For example, in *Illinois Brick* the damages consisted of overcharges assessed by a brick manufacturer in sales to a masonry contractor. The masonry contractor passed on the damages by overcharging the general contractor who, in turn, overcharged its client, the state of Illinois. The question was whether the state could recover as an indirect purchaser of the manufacturer's products.

The Court decided against permitting Illinois to sue for injury that had also been sustained by the contractors for two reasons. First, the Court felt that an affirmative holding would create an unnecessary risk of double recovery because nothing barred all other purchasers from thereafter deciding to sue on their own. *Id.* 431 U.S. at 737–40, 97 S.Ct. 2061. Second, if the court attempted to apportion damages to prevent double recovery, enormous problems of proof would render recovery sufficiently uncertain to dissipate the incentive for any particular purchaser to sue. *Id.* at 741–47. The spectre of courts' being trapped between the Scylla of permitting multiple liability and the Charybdis of undermining the incentive to sue led the Court to overrule the indirect purchaser doctrine.

The indirect purchaser doctrine under the price discrimination provisions, however, does not implicate similar considerations. That doctrine does not serve to protect buyers who have suffered "pass along" damages. The wholesaler which functions as a conduit for discriminatory prices itself sustains no injury because it is not in competition with the favored retailer. Only the indirect purchaser who must compete in the resale of the defendant's products with the favored direct purchaser suffers from the unequal prices charged by the supplier. Thus, the indirect purchaser doctrine under §§ 2(a) & 2(f) allows buyers to recover damages suffered by them exclusively. For that reason, no difficulties of proof in allocating damages or risks of multiple recovery arise. The rationale for disallowing suits by indirect purchasers given voice in *Illinois Brick* is therefore inapposite to cases brought under §§ 2(a) & 2(f).

low suit. While Transit-Mix was charging Nasso the higher price, Certified was sharing the additional profits with DIC–Underhill so that the effective price charged to DIC–Underhill was less than that charged to Nasso by Transit-Mix. The ultimate effect of Certified's charging unequal prices "through" Transit-Mix, of course, was to give DIC–Underhill a competitive advantage in bidding for subcontracts against Nasso.

Although Nasso's ingenuity merits recognition, it seems to the court that its argument stretches the indirect purchaser doctrine beyond its appropriate scope. In substance, Nasso seeks to litigate, under the rubric of price discrimination, injuries that should be contested under other sections of the antitrust laws. Defendant's vertical integration and alleged anti-competitive plan can be and, indeed, are being challenged under Clayton Act § 7 and Sherman Act §§ 1 & 2. It is quite doubtful, however, that the cost disadvantage Nasso claims to suffer results from actions that fit the definition of price discrimination contemplated by Congress.

In essence, Nasso complains of the combined effect of two separate actions. First, it objects to Certified's raising its prices without legitimate business justification and second, it opposes Transit-Mix's following the price increases without independently reviewing the basis for them. Taken alone, neither step would constitute an antitrust violation. Price rises are obviously not actionable unless made to accomplish some prohibited purpose, and price following is not illegal unless performed pursuant to some sort of agreement to restrain or monopolize trade. *See* Callmann, *Unfair Competition and Monopolies,* Vol. 5 § 15.-3(d)(1). That the combined effect of these measures is to interfere with Nasso's ability to compete for contracts may be grounds for inferring that unlawful collusion or intention is afoot. But Nasso can not avoid the necessity of showing an illegal purpose or plan by characterizing defendants' acts as price discrimination when Nasso neither bought nor attempted to buy supplies from Certified.

That Nasso's claim does not arise from price discrimination by Certified is evident from the opinion in *F.T.C. v. Fred Meyer, supra.* Although the Court removed the requirement that the price discriminator control the prices charged by its wholesaler, it did not contemplate holding the manufacturer responsible for prices which the wholesaler was wholly free to set. In that case, the supplier sold to a large retailer and to its wholesaler at the same price. Economic necessity dictated that the wholesaler resell above cost and thereby convey a higher price to small retailers than that charged to the large retailer. Thus, although the manufacturer did not control the ultimate price charged by the wholesaler, it was clearly responsible for the unequal costs imparted to the small retailers and the volume buyer. In the present case, however, no economic law impels Transit-Mix to follow Certified's pricing schedule. Its decision to do so, if untainted by evidence of conspiracy, must be assumed to be completely independent. Under those circumstances, I can not see how Certified can be held responsible for the prices Transit-Mix chooses to charge Nasso.

Any claim of injurious vertical integration is based upon the integrated enterprise's favoring parts of its own business to the detriment of that business's competitors. As a consequence, allowing competitors whose injury did not result from buying a defendant's products to sue as indirect purchasers would be tantamount to permitting every claim of unlawful integration to be recast as one of price discrimination. It seems to the court that Congress did not intend for every disadvantage suffered by a competitor of an integrated supplier to be automatically actionable under §§ 2(a) & 2(f). The problems of vertical integration and price discrimination were addressed separately in different provisions of the Clayton Act, with the latter concept directed at cases in which goods from a single source are sold at inconsistent prices to buyers in competition with each other. Therefore, since Nasso never purchased Certified's products, directly or indirectly, I

find that it has no standing to sue under §§ 2(a) & 2(f). Nonetheless, the facts pleaded under these provisions are relevant to determining whether defendants' actions, taken together, violate the more general prohibitions of the Sherman or Clayton Acts. Callmann, *supra,* § 28.1(a) (pricing policies lawful under §§ 2(a) & 2(f) nonetheless subject to independent scrutiny under general antitrust provisions).

*Merger*

■ Clayton Act § 7 (15 U.S.C. § 18) reads as follows:

No corporation . . . shall acquire, directly or indirectly, the whole or any part of the stock or other share capital . . . of another corporation . . where . . . the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

Defendants first argue that the acquisition of Certified is not covered by the above language because the statute applies only to corporations. They argue that since the complaint alleges that either DIC–Underhill (a joint venture) or DePaola, Goldstein, Phelan, Bertone, and Jereski (individuals) obtained control of Certified, that portion of the complaint must be dismissed. In support of this position, they cite *Hudson Valley Asbestos Corp. v. Tougher Heating and Plumbing Co.,* 510 F.2d 1140 (2d Cir.), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2416, 44 L.Ed.2d 679 (1975) and *Bender v. Hearst Corp.,* 152 F.Supp. 569 (D.Conn.1957), *aff'd on other grounds,* 263 F.2d 360 (2d Cir. 1959).

The District Court's restrictive reading of the word "corporation" in *Bender* is not controlling here. The court there held that the assets of the company being acquired must be corporate assets and not those held by individuals. The issue in the case at bar, in contrast, is whether the entity doing the acquiring need be a corporation as opposed to a joint venture or individuals. Because the court was interpreting the use of the word "corporation" in the provision as an object and not as a subject, the holding in *Bender* is inapposite. In addition, *Bender* is

a weak precedent because the Court of Appeals declined to endorse the District Court's narrow interpretation and instead affirmed on other grounds.

Under either hypothesis—that Certified was acquired by a joint venture or by individuals—defendants are not entitled to dismissal. In *Hudson,* the court dismissed a § 7 claim against individuals after it was shown that they had not acted on behalf of a corporation in which they had a substantial interest as shareholders and officers. The court reasoned that the word "corporation" was used in § 7 to distinguish between acquisitions of stock for personal investment and acquisitions of stock for the purpose of taking over managerial control. Only when satisfied that the named individuals did not utilize corporate funds in their purchases and did not plan to assume or in fact assume control over the activities of the acquired enterprise did the court order dismissal. Since defendants have not yet filed an answer, nothing before the court contradicts Nasso's allegation that the individual defendants acquired Certified on behalf of the corporate subcontractors constituting DIC–Underhill. Certainly, defendants have not proved that DePaola, Goldstein, Phelan, Bertone, and Jereski bought stock in Certified only as private investments. Consequently, Nasso is free to show that defendants have used and continue to use their stock in Certified for the benefit of the corporate defendants, which showing would bring them well within the scope of § 7 as interpreted by the court in *Hudson.*

If it turns out that DIC–Underhill, the joint venture, acquired Certified, § 7 still applies. In *United States v. Penn-Olin Chemical Company,* 378 U.S. 158, 167, 84 S.Ct. 1710, 12 L.Ed.2d 775 (1964), the Court applied the anti-merger provision to the creation of a joint venture, despite the fact that the companies did not acquire each other's corporate shares, and instead obtained shares in the newly created joint venture. The Court refused to exalt form over substance:

The test of the section is the effect of the acquisition. Certainly the formation of a

joint venture and purchase by the organizers of its stock would substantially lessen competition—indeed foreclose it—as between them . . . .

378 U.S. 168, 84 S.Ct. 1715. Similar reasoning applies to corporate acquisitions undertaken after the joint venture is already constituted. DIC–Underhill is a partnership among three corporations expressly acting in concert. A holding that it is exempt because it can technically be characterized as a joint venture and not a corporation would create a loophole encouraging combination in direct. contravention of the purpose of § 7. I can not understand the argument that DIC–Underhill is immune from regulations that apply to its corporate components. Surely the policy of shielding private investments does not justify excluding from coverage joint ventures constituted by corporations. Thus, that Certified may have been acquired by either DIC–Underhill or the named individuals (and not by a "corporation") does not necessarily exclude the transaction from the ambit of § 7. Consequently, defendants' motion to dismiss that portion of the complaint is denied.

Defendants also make a three-pronged argument to dismiss the § 7 claim on the ground that the remedies Nasso seeks are unavailable. They contend that an award of money damages is barred by the four year statute of limitations for private damage actions (15 U.S.C. § 15b), that injunctive relief is barred by laches (presumptively measured by the four year limitations period), and that an order of divestiture may not be issued in a private antitrust suit. Since the assertions with respect to the untimeliness of the action are premised on the same argument, they will be treated together.

Defendants theorize that Nasso's causes of action under § 7 accrued at the time the allegedly prohibited mergers took place. That reasoning would bar Nasso's claims because both the formation of DIC–Underhill and the acquisition of Certified occurred more than four years prior to the institution of this action. Nasso readily admits that the combinations predate the filing of

suit by more than four years, but it rejects the notion that the § 7 claims accrued at the time the mergers were consummated.

The general rule for determining the date upon which a cause of action accrues under the antitrust laws was announced in *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971). In that opinion, the Court held that a new cause of action arises from the commission of *each* prohibited act that causes damage to another party's business. Thus, in order for defendants to prevail, they would have to show that the only acts prohibited by § 7 are the initial acquisitions of stock which decrease or threaten to decrease competition.

Construing § 7 to reach only conduct pertaining to initial mergers would violate the Supreme Court's ruling in *United States v. E. I. DuPont de Nemours and Co.*, 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957). There the Court held that § 7 regulated the "subsequent use of the [acquired] stock" as well as the "acquisition of stock." *Id.* 353 U.S. at 596–97, 77 S.Ct. 872. Thus, in addition to prohibited acquisitions giving rise to immediate § 7 claims, subsequent anti-competitive acts committed by the merged enterprise give rise to separate causes of action. For example, the government in *DuPont* was allowed to seek divestiture of stock obtained 40 years earlier on the theory that it may proceed under § 7 "anytime when the acquisition threatens to ripen into a prohibited effect." *Id.* at 597, 77 S.Ct. at 879. Under this construction, Nasso's charges about Certified's pricing policy and DIC–Underhill's misuse of its bonding power may be dated from the time these events actually transpired and not only from the date of the mergers which made these actions possible.

Defendants attempt to avoid this implication of *DuPont* by arguing that the holding in that case applies only in suits brought by the government. To support this viewpoint, they cite *International Telephone and Telegraph Corp. v. General Telephone and Electronics Corp.*, 518 F.2d 913 (9th Cir. 1975), in which the Ninth Circuit refused to

award a private plaintiff damages for illegal acquisitions more than four years prior to the commencement of the lawsuit, and in which the court refused to grant injunctive relief on the same claims unless "sufficient reasons, traditionally cognizable in equity, existed which prevented the plaintiff from making a timely challenge, or . . . the delay caused GTE no prejudice. . ." *Id.* at 929. The court read *Du Pont* to allow only the government to challenge acquisitions more than four years past because the doctrine of laches does not apply to the sovereign and because 15 U.S.C. § 25, "the provision under which the government sues for equitable relief, is not expressly limited, as is § 16, [the provision under which private parties sue for equitable relief] by the 'same conditions and principles' as govern relief granted by courts of equity." *Id.* at 928.

The impact of the decision in *ITT*, however, is very narrow. The interpretation of § 7 as governing the subsequent behavior of integrated enterprises was not questioned. All that was decided was that a private plaintiff could not challenge acquisitions of stock over four years after the merger occurred. Nonetheless, a private plaintiff could recover for injury resulting from subsequent anti-competitive acts taken by the defendants within four years of the institution of the action.

The distinction between challenging acquisitions under § 7 and challenging subsequent acts taken by the integrated enterprise reflects much more than lawyers' passion for hairsplitting. The Supreme Court recently reaffirmed that different substantive standards govern the two kinds of claims. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). Where an acquisition is challenged, the test is whether the merger "*may be* substantially to lessen competition, or *to tend to* create a monopoly." (emphasis is original) *Id.* 429 U.S. at 485, 97 S.Ct. at 695. Damages are still speculative and the only relief that may be had is an injunction against prospective harm. In contrast, where actions taken after the merger are

challenged, actual damages must be shown; it is no longer sufficient to show merely the potential for harm. Thus, the practical effect of the court's ruling in *ITT* is to prevent private plaintiffs suing over four years after an acquisition has taken place from availing themselves of the prophylactic rule prohibiting mergers with probable anti-competitive effects and to require them to show actual or imminent injury to competition resulting from acts committed or threatened after the combination.

At most, then, Nasso may be precluded from obtaining injunctive relief premised on the probability that the formation of DIC–Underhill and the acquisition of Certified would lessen competition. But on the current record, I can not find Nasso guilty of laches, even to that limited extent. The doctrine of laches bars a claim only where the delay in filing suit prejudices a defense available to a party opponent, *Fuchs Sugars & Syrups, Inc.*, 402 F.Supp. 636, 640 (S.D.N.Y.1975) (Ward, J.), and defendants have not even attempted to show such prejudice.

Defendants also argue that an order of divestiture is unavailable in any private suit under § 7. After a review of the legislative history, the court in *International Telephone and Telegraph Corp. v. General Telephone and Electronics Corp., supra,* 518 F.2d 920–25, concluded that Congress intended to exclude the power to grant an order of divestiture from the general grant of authority to fashion injunctive relief in antitrust suits brought by private plaintiffs. Defendants rely exclusively on the reasoning of that case. Nasso relies on the Third Circuit's dictum in *NBO Industries Treadway Cos., Inc. v. Brunswick Corp.,* 523 F.2d 262 (3rd Cir. 1975), *rev'd on other grounds, sub nom., Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), that divestiture may be ordered in an appropriate private suit under § 7. Although the legislative history tending to show that divestiture was not contemplated as a remedy in private suits is admittedly weak (because based on floor debates rather than formal indicia of Con-

gressional intent), the Third Circuit did not object to the holding in *ITT* on that ground. Instead, the court approached the problem in a wholly different light:

> It is quite another question whether legislative history from 1914, *strong as it appears*, should control the contemporary application of a statute laying down a fundamental national economic policy.

523 F.2d 278 (emphasis added). Thus the court felt that a more meaningful question was whether a blanket prohibition against divestiture in private suits would facilitate or impede the accomplishment of the general purposes behind § 7.

Judge Ward of this court adopted the Third Circuit's approach and permitted a private party to sue for divestiture. *Fuchs Sugars & Syrups, Inc. v. Amstar Corporation*, 402 F.Supp. 636 (S.D.N.Y.1975). He found that a *per se* rule against ordering divestiture in private § 7 cases would interfere with the broader purposes behind the provision. Judge Ward relied on Justice Brennan's observation that:

> Divestiture has been called the most important of the antitrust remedies. It is simple, relatively easy to administer and sure. It should always be in the forefront of a court's mind when a violation of § 7 has been found.

402 F.Supp. 640, *quoting United States v. DuPont & Co.*, 366 U.S. 316, 330–31, 81 S.Ct. 1243, 6 L.Ed.2d 378 (1961). Even the court in *ITT* admitted that the effect of its holding was to "withhold from private parties the simplest, easiest, and surest form of relief for antitrust [violations] 'whose heart is intercorporate combination and control . . .' [citations omitted]." *Id.* 518 F.2d at 925.

When the legislative history recounted in the *ITT* opinion is weighed against the effective realization of an important national policy, it seems that the latter should control. Indeed, the structure of both the economy and anti-trust law itself have developed so significantly since 1919 that formalistic adherence to a doubtful legislative history is a less reliable means of ascertaining Congressional intention than a consider-

ation of the general purposes behind the adoption of the anti-merger provisions. Carving out an exception for divestiture from the general grant of power to fashion equitable remedies is contrary to the general purpose behind § 7, and this court agrees with Judge Ward that there is not sufficient reason to do so absent express Congressional mandate. Since divestiture may be ordered in an appropriate private suit, and since Nasso's requests for injunctive and monetary relief are not time-barred, defendants' motion to dismiss the § 7 claims is denied.

*Conspiracy to Restrain Trade*

Defendants also move to dismiss the Sherman Act claims against the named individuals for failure to plead specifically their role in the alleged conspiracy to restrain and monopolize trade. While this argument might have some weight if discovery had been completed, it is premature at this stage. In a similar context, the court in *Beckman v. Walter Kidde & Company*, 316 F.Supp. 1321 (E.D.N.Y.1970), stated:

> The unembellished allegation of conspiracy, unsupported by any particulars disclosing a triable issue which can be called genuine, *although sufficient to stand as a pleading*, is insufficient to withstand a motion for summary judgment—especially after an opportunity has been given to offer details.

316 F.Supp. 1321, 1325. (emphasis supplied). *But see Nelson Radio & Supply Co. v. Motorola*, 200 F.2d 911 (5th Cir. 1952). In any case, Nasso *has* set forth facts that may amount to a conspiracy; it is merely unable at this time to particularize the roles allegedly played by the named individuals. Before any discovery has been taken, this is enough to allow Nasso to survive a motion to dismiss, especially where, as here, the defendant companies are privately held and therefore do not publicize their activities.

*Summary*

Defendants' motion to dismiss the price discrimination claims is granted because

Nasso has no standing to sue under Robinson-Patman Act §§ 2(a) & 2(f). Defendants' motion to dismiss the merger claims is denied because the relief Nasso seeks is neither prohibited nor time-barred, and the defendant joint venture and individuals are not exempt from Clayton Act § 7. Last, defendants' motion to dismiss the Sherman Act claims against the named individuals is denied because Nasso has pleaded facts that, if proved, would be sufficient to support a finding of conspiracy.

IT IS SO ORDERED.